Elmer J. JONNET et al., Appellants,

v.

DOLLAR SAVINGS BANK OF the CITY OF NEW YORK et al.

No. 75–1529.

United States Court of Appeals, Third Circuit.

Argued Dec. 9, 1975.

Decided Jan. 27, 1976.

As Amended Feb. 9, 1976.

---

**1124**

Gibbons, Circuit Judge, concurred and filed opinion.

Samuel M. Rosenzweig, Rosenzweig & Rosenzweig, John M. Feeney, Harrington, Feeney & Schweers, Pittsburgh, Pa., for appellants.

J. Tomlinson Fort, Eric P. Reif, Reed Smith Shaw & McClay, Pittsburgh, Pa., Dwight B. Demeritt, Jr., Joan H. Hillenbrand, Thacher, Proffitt & Wood, New York City, for appellee, Dollar Savings Bank of the City of New York.

Before SEITZ, Chief Judge, and GIBBONS and ROSENN, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

Once again the constitutionality of Pennsylvania foreign attachment procedures [1] are before this court. Four years ago in *Lebowitz v. Forbes Leasing & Finance Corp.*, 456 F.2d 979 (3d Cir. 1972), *cert. denied*, 409 U.S. 843, 93 S.Ct. 42, 34 L.Ed.2d 82, *rehearing denied*, 409 U.S. 1049, 93 S.Ct. 509, 34 L.Ed.2d 502 (1972), we sustained the constitutionality of these procedures against a procedural due process attack. Due process, however, is a dynamic concept; refinements are evolved from time to time. In light of the latest elaborations by the Supreme Court, we conclude that *Lebowitz* is no longer viable and that the Pennsylvania foreign attachment procedures must be declared unconstitutional.

### I.

In *Lebowitz*, Chief Judge Seitz succinctly described Pennsylvania foreign attachment procedures as follows:

> Pennsylvania foreign attachment procedures authorize the issuance of a writ by the prothonotary without notice to the defendant, without any hearing, without an affidavit of meritorious action, without the posting of a

---

1. Pennsylvania Rules of Civil Procedure 1251–1279.

bond, and without intervention by a judicial officer. Indeed, the attachment may precede the filing of the complaint by as much as five days. Once the attachment becomes effective, it is not dissolved by the general appearance of the defendant. Rather, dissolution occurs only if, inter alia, the defendant posts an adequate bond or other acceptable security or the plaintiff fails to prosecute his case with due diligence. Also, provision is made that if the defendant can demonstrate that the amount of property attached is excessive when compared to the amount in controversy he may obtain a reduction. 456 F.2d at 980.

Only a few additional provisions need be mentioned. A foreign attachment can issue only against an individual who is a nonresident of the Commonwealth, a partnership or unincorporated association without a regular place of business in the Commonwealth, or a foreign corporation which is not registered in the Commonwealth. Pa.R.Civ.P. 1252. The action is commenced by filing with the prothonotary[2] a praecipe for a writ which shall direct the sheriff to attach stated property. "The prothonotary shall immediately enter the attachment against the defendant in the judgment index." Pa.R.Civ.P. 1255. The statute does not require that the defendant be served with the writ or complaint. Pa.R. Civ.P. 1265, 1267, 1269. The function of notifying the defendant is delegated to the garnishee. Pa.R.Civ.P. 1267.

Plaintiffs Elmer J. Jonnet, Jonnet Development Corporation, and Jonnel Enterprises, Inc., (collectively, Jonnet) invoked these procedures by filing "Complaint in Assumpsit with Foreign Attachment," alleging that Dollar Savings Bank of the City of New York (Dollar) wrongfully failed to honor a mortgage commitment for $1,100,000.[3] Several days later, plaintiffs filed a praecipe for writ of foreign attachment pursuant to Pa.R.Civ.P. 1255.[4] The writs were issued by the U.S. Clerk of Court and served by the U.S. Marshal on two corporate garnishees, who were indebted to Dollar in an aggregate amount over $1,300,000 and who were obliged to make monthly installment payments to Dollar in amounts totaling over $10,000. Monthly payments for August 1973 were not made to Dollar because of the attachments.

On August 20, 1973, the district court, acting on Dollar's motion and pursuant to Pa.R.Civ.P. 1272(c), dissolved the attachment and permitted Dollar to substitute security in the form of U.S. Treasury notes totaling $50,000. In its motion to dissolve the attachment, its answer, and subsequent motion filed October 11, 1974, Dollar challenged the constitutionality of the instant procedures. Judge Teitelbaum, in a carefully considered opinion, held the foreign attachment procedures unconstitutional and granted Dollar's motion to dismiss the action. This appeal followed.[5]

## II.

The basic issue before us is whether Pennsylvania summary procedures for jurisdictional attachment of property of

---

2. In Pennsylvania, the prothonotary is the clerk of the civil court. *See Whitney v. Hopkins*, 135 Pa. 246, 19 A. 1075 (1890).

3. Federal jurisdiction was predicated on diversity of citizenship, 28 U.S.C. § 1332 (1970).

4. Dollar Savings Bank is a New York corporation not registered to do business in Pennsylvania. Because the Pennsylvania "long-arm" statute, 42 Pa. C.S.A. § 8301 et seq., excepts acquiring mortgages from its definition of "doing business," 42 Pa. C.S.A. § 8309(c), foreign attachment was the only jurisdictional basis on which the suit could be maintained. Federal courts' use of Pennsylvania foreign attachment procedures is authorized by Fed.R.Civ.P. 64.

5. In its brief and at oral argument, plaintiffs suggested that Dollar waived the defense of lack of jurisdiction by (1) filing security, Pa.R. Civ.P. 1269(b), and (2) conducting discovery for over a year before bringing the jurisdictional issue to a head by motion. Dollar's initial motion for dissolution of the attachment raised the constitutional claim and moved for dissolution "pending a disposition by this Court of the Constitutional issue." Its answer, filed thereafter, raised lack of jurisdiction and the constitutionality of the foreign attachment procedures as separate defenses. Dollar's initial motion carefully and reasonably preserved the constitutional issue under the Pennsylvania rule. Dollar effectively preserved the con-

a corporation not registered and having no regular place of business in the Commonwealth in a suit by a resident plaintiff comports with fundamental fairness, in the absence of notice to the defendant prior to attachment, an opportunity for prompt hearing to challenge the attachment, and other procedural safeguards against wrongful seizure.

Procedural due process issues have been the subject of much recent Supreme Court litigation.[6] None of these cases have specifically considered the issue before us, but several have analyzed prejudgment attachment procedures for debtor-creditor suits. The Supreme Court opinions have produced not only varying results, but differing analytical approaches to due process problems.

The earliest case in this line of decisions is *Sniadach v. Family Finance Corporation,* 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969), which held Wisconsin prejudgment garnishment procedures unconstitutional. That decision appeared to evince a particular concern for "wages —a specialized type of property", 395 U.S. at 340, 89 S.Ct. 1820, and mandated that the affected individual receive notice and a hearing before garnishment. *Sniadach* spawned two divergent lines of cases—one limiting Sniadach's predeprivation notice and hearing rule to wages or property of similar importance

to the individual, the other invalidating prejudgment procedures generally.[7] The Supreme Court put its imprimatur on the latter line in *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). The Court there held unconstitutional Florida and Pennsylvania prejudgment replevin procedures utilized to recover household goods purchased under conditional sales contracts and on which payments were allegedly overdue. The Court stated that even a temporary, nonfinal deprivation of property in which an individual had less than full title was sufficient to invoke due process protection. 407 U.S. at 84–87, 92 S.Ct. 1983. Furthermore, procedural guarantees were not limited to items of "necessity." 407 U.S. at 88–90, 92 S.Ct. 1983. The constitutional rule enunciated was that except in "extraordinary situations,"[8] notice and hearing must precede any deprivation of property.

Two years later the Court seemingly interred *Fuentes* when it approved Louisiana sequestration procedures. *Mitchell v. W. T. Grant Co.,* 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974). The Court appeared to abandon the strict pre-seizure hearing rule of *Fuentes* and instead substitute a balancing of interests analysis.[9] The Court identified two policies behind the Louisiana procedures—(1) protecting from concealment, or waste,

stitutional issue under the federal rules by raising it in a motion to dissolve attachment and in its initial responsive pleading. *See* Fed. R.Civ.P. 12(h)(1)(B).

**6.** *See generally,* Note, Specifying the Procedures Required by Due Process: Toward Limits on the Use of Interest Balancing, 88 Harv.L. Rev. 1510 (1975) [hereinafter Procedural Due Process].

**7.** *See,* cases collected in *Fuentes v. Shevin,* 407 U.S. at 72–73, n.5, 92 S.Ct. 1983; *Lebowitz v. Forbes Leasing and Finance Corporation,* 326 F.Supp. 1335, 1341–48 (E.D.Pa.1971); Comment, 57 Minn.L.Rev. 396 (1972).

**8.** 407 U.S. at 90, 92 S.Ct. at 1983. These "truly unusual" situations said the Court, have three common characteristics:

First, in each case, the seizure has been directly necessary to secure an important governmental or general public interest. Second, there has been a special need for very prompt action. Third, the State has

kept strict control over its monopoly of legitimate force: the person initiating the seizure has been a government official responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in the particular instance. 407 U.S. at 91, 92 S.Ct. at 2000.

**9.** The Court stated that the "usual rule has been '[w]here only property rights are involved, mere postponement of the judicial enquiry is not a denial of due process, if the opportunity given for ultimate judicial determination of liability is adequate. *Phillips v. Commissioner of Internal Revenue,* 283 U.S. 589, 596–597, 51 S.Ct. 608, 611, 75 L.Ed. 1289 (1931).'" 416 U.S. at 611, 94 S.Ct. at 1902. Justices Powell, 416 U.S. at 623–29, 94 S.Ct. 1895, Stewart, Douglas, and Marshall, 416 U.S. at 629–36, 94 S.Ct. 1895, concluded that the *Fuentes* analysis had been abrogated, and commentators so read the case. *See,* e. g., The Supreme Court, 1973 Term, 88 Harv.L. Rev. 41, 71 (1974).

property in which the creditor, as well as the debtor, had a proprietary interest, 416 U.S. at 604–5, 94 S.Ct. 1895, and (2) averting self-help measures by the creditor, which could engender violence. 416 U.S. at 605, 94 S.Ct. 1895. In light of these policies, the debtor's concern with protecting his property interest from arbitrary or wrongful deprivation was adequately protected by sequestration procedures that: (1) required a creditor to file an affidavit stating "specific facts" entitling him to sequestration; (2) mandated that the writ was issuable only by a judge; (3) required the creditor to file a bond to protect the debtor from all damages in the event the sequestration was shown to have been wrongful; (4) entitled the debtor to dissolve the sequestration by filing his own bond; and (5) entitled the debtor to an immediate hearing after seizure and to dissolution of the writ absent proof by the creditor of the grounds on which the writ was issued.[10]

That the *Fuentes* analysis continued to retain some vitality was demonstrated by a decision filed two days after *Mitchell*. In *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974), the Court sustained the constitutionality of Puerto Rican statutes providing for forfeiture, without prior notice or hearing, of vessels used for unlawful purposes, by applying the "extraordinary situation" exception of *Fuentes.*

The requiem for *Fuentes'* "demise" soon appeared to have been chanted prematurely. *See North Georgia Finishing, Inc. v. Di-Chem, Inc.*, 419 U.S. 601, 608, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975) (Stewart, J., concurring). The Court in *Di-Chem* not only again held a garnishment statute unconstitutional, but ap-

peared, to some extent, to resuscitate *Fuentes. See* 419 U.S. at 609–614 (Powell, J., concurring). *Procedural Due Process*, note 5 *supra*, 88 Harv.L.Rev. at 1514. The Georgia procedures were held constitutionally insufficient because (1) they allowed a writ of garnishment to issue on affidavit by a creditor or his attorney containing only conclusory allegations; (2) the writ was issuable by the court clerk without participation by a judge; (3) the garnishment could be dissolved only by the filing of a bond, which continued to deprive defendant of the use of some property; and (4) there was no provision for an early hearing at which the creditor would be required to demonstrate at least probable cause for the garnishment. 419 U.S. at 607, 95 S.Ct. 719.

Although these recent Supreme Court decisions have dealt with the constitutionality of debtor-creditor attachments, their implications for foreign attachments cannot be ignored. An older decision dealing with foreign attachments, *Owenbey v. Morgan*, 256 U.S. 94, 41 S.Ct. 433, 65 L.Ed. 837 (1921), has been cited several times.[11] *Ownbey* upheld the constitutionality of a Delaware attachment statute which prevented the entry of appearance and defense by a non-resident individual defendant whose property had been attached, except on posting of special bail. Ownbey, who could not post the bail, attacked only the bail requirement. Although he did not challenge the validity of the attachment process, the Supreme Court not only sustained the bail requirement, but in broad dictum approved the attachment as well. 256 U.S. at 110–12, 41 S.Ct. 433.

In both *Sniadach*, 395 U.S. at 339, 89 S.Ct. 1820, and *Fuentes*, 407 U.S. at 91,

---

**10.** The Court distinguished *Sniadach* on several grounds, but primarily on *Sniadach's* concern with the protection of wages. *416 U.S. at 614, 94 S.Ct. 1895.* It distinguished *Fuentes* on the grounds that the Florida and Pennsylvania replevin statutes did not provide the protections afforded by the Louisiana sequestration statute and that, while the issues in sequestration are "narrowly confined" to the existence of the lien and default, the "broad 'fault' standard" employed in the Florida and

Pennsylvania statutes was "inherently subject to factual determination and adversarial input." *416 U.S. at 616–18, 94 S.Ct. 1895, 1905.*

**11.** The problem has also been the subject of scholarly commentary. *See* Folk and Moyer, Sequestration in Delaware: A Constitutional Analysis, 73 Colum.L.Rev. 749 (1973) [hereinafter Folk and Moyer]; Note, Quasi in Rem Jurisdiction and Due Process Requirements, 82 Yale L.J. 1023 (1973) [hereinafter Yale Note].

n.23, 92 S.Ct. 1983, *Ownbey* was cited as an example of an extraordinary situation in which summary procedures "may well meet the requirements of due process." 395 U.S. at 339, 89 S.Ct. at 1821. *Ownbey* was also cited, somewhat ambiguously, in *Mitchell*; apparently as an example of Supreme Court approval of prehearing seizure.

### III.

A question critical to the resolution of this case is the continuing vitality of *Ownbey*. The case might be read to mandate the validity of the Pennsylvania procedures here at issue. *See Lebowitz v. Forbes Leasing & Finance Corp.*, 326 F.Supp. 1335, 1352–3 (E.D.Pa.1971), *aff'd*, 456 F.2d 979, 982 (3d Cir. 1972), *cert. den.* 409 U.S. 843, 93 S.Ct. 42, 34 L.Ed.2d 82, *reh. den.* 409 U.S. 1049, 93 S.Ct. 509, 34 L.Ed.2d 502 (1972); *Balter v. Bato Company, Inc.*, 385 F.Supp. 420 (W.D.Pa.1974). Indeed, that is the position plaintiffs urge upon us. *Ownbey*, however, might be limited to its holding sustaining the validity of the special bail requirement. *See In Re Law Research Services, Inc.*, 386 F.Supp. 749, 753 (S.D. N.Y.1974). *See also*, Yale Note, note 10, *supra*, at 1030–31 (suggesting that *Ownbey* should be limited to its historical context).

Whether one reads *Ownbey* narrowly or broadly, it is apparent that the holdings, if not the language, of *Fuentes, Mitchell*, and *Di-Chem* cast serious doubt on *Ownbey's* current strength. The Court's manifest concern with fair procedures, whether by hearing or otherwise, to protect an individual or corporation [12] from arbitrary or wrongful deprivations of any property for even a short period of time, reflects a changing view of due process much more attuned to the realities of present times than is the *Ownbey* justification of the bail requirement. *Ownbey* rested on the ground, perhaps valid then but hardly today, that "ordinarily it is not difficult to comply with—a man who has property usually has friends and credit—and hence in its normal operation it must be regarded as a permissible condition." 256 U.S. at 111, 41 S.Ct. at 438. Nor does the antiquity or widespread prevalence of a procedure, on which the *Ownbey* court relied, 256 U.S. at 108–112, 41 S.Ct. 433, render it absolute and inviolate. *See* Folk and Moyer, note 10, *supra*, at 758–9. *Cf. Sniadach v. Family Finance Corp.*, 395 U.S. at 340, 89 S.Ct. 1820. *Fuentes, Mitchell* and *Di-Chem* reflect a growing sensitivity in concepts of fundamental fairness in administering justice, reasonable requirements in legal procedures, and a realistic recognition of the enormous role played today by credit transactions in the consumer and commercial life of our complex economy. The rationale of *Ownbey* is no longer in harmony with the principles of *Fuentes* and its progeny. A balance must be struck between providing effective creditor remedies and the risk to the debtor of wrongful deprivation.

Furthermore, the more recent citations of *Ownbey* do not necessarily indicate approval. *Sniadach* introduces a note of uncertainty to summary procedures, such as in *Ownbey*, stating they "*may* well meet the requirements of due process . . . ." 395 U.S. at 339, 89 S.Ct. at 1821. [emphasis supplied]. The citation in *Fuentes* and *Mitchell* is no more than an example of a situation in which preseizure hearing is not required. One cannot read these citations as endorsing all aspects of the *Ownbey* opinion. *Cf. In Re Law Research Services, Inc.*, 386 F.Supp. 749, 753 (S.D.N.Y.1974); *U. S. Industries Inc. v. Gregg*, 348 F.Supp. 1004, 1021 (D.Del.1972).

Thus, we believe that *Ownbey* today must be limited to the proposition for which it was cited in *Fuentes* and *Mitchell*—that due process does not require that foreign attachments be preceded by notice and a hearing.

### IV.

■ We infer from the current crop of Supreme Court decisions that the pre-

---

**12.** *North Georgia Finishing, Inc. v. Di-Chem, Inc.*, 419 U.S. at 608, 95 S.Ct. 719.

vailing rule of procedural due process is that official seizures can be constitutionally accomplished only with either "notice and . . . opportunity for a hearing or other safeguard against mistaken" taking.[13] *North Georgia Finishing, Inc. v. Di-Chem, Inc.*, 419 U.S. 601, 606, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975). Since recent citations of *Ownbey* have made it clear that pre-seizure notice and hearing are not required for jurisdictional attachment, we must consider the constitutional adequacy of the "other safeguards" provided by the Pennsylvania procedures. The "overriding consideration must be whether the statute minimizes the risk that the ex parte issuance of a writ will result in a wrongful or arbitrary deprivation consistent with the protection of legitimate creditor's remedies." *Hutchinson v. Bank of North Carolina*, 392 F.Supp. 888, 894 (M.D.N.C. 1975) (three-judge court). Our model is drawn from the Court's analysis in *Mitchell* and *Di-Chem.*

Determination of the fairness of the procedures provided requires consideration of the competing interests at stake in jurisdictional attachments. A prospective plaintiff has two interests in utilizing foreign attachment procedures: establishing jurisdiction in a desired forum[14] and restraining a res within the control of the court for the eventual payment of a successfully established claim. The potential defendant's interests are not only in maintaining complete control over the disposition and use of his property, but also in his ability to defend the particular lawsuit. If he is compelled to defend in an inconvenient forum by means of foreign attachment of valuable property, his position in seeking dismissal, summary judgment, or settlement negotiations might be substantially weakened.

■ We deem the Pennsylvania procedures to serve only the potential plaintiff's interests and to provide insubstantial protection to the prospective defendant against wrongful attachment. First, we note that the attachment process is commenced by the filing of a praecipe, which apparently only need specify the property to be seized. Pa.R.Civ.P. 1255. Indeed, a complaint need not be filed until five days thereafter. Pa.R.Civ.P. 1265. There need be no facts alleged setting forth the basis for the attachment or even the colorability of the underlying claim. 2 Goodrich-Amram, Standard Pennsylvania Practice, § 1255(a)–1 p. 66. Such a procedure provides no protection against frivolous claims. Some protection can be achieved with minimal inconvenience to a plaintiff. We read *Mitchell* and *Di-Chem* to require, at a minimum, that the process cannot be instituted without an affidavit or other sworn document stating substantially facts on which the cause of action is predicated, the amount claimed, that the defendant is a non-resident, and that the defendant has specified property in the state.

Second, the foreign attachment rules make the seizure process entirely minis-

---

**13.** As discussed above, *Fuentes,* fortified by *Calero-Toledo,* seems to establish the proposition that, except in extraordinary circumstances, preseizure notice and hearing are required. Since foreign attachments necessary to secure jurisdiction qualify as an "extraordinary situation," 407 U.S. at 91, n.23, 92 S.Ct. 983, the instant procedures could be evaluated in light of the three criteria established for such situations. *See* n.7 *supra.* Indeed, the district court in this case took that route and concluded that the Pennsylvania procedures do not provide the requisite strict governmental control over the use of force.

*Mitchell* and *Di-Chem,* however, would appear to require a balancing of interests approach. *See,* e. g., *Hutchinson v. Bank of North Carolina,* 392 F.Supp. 888, 895 n.8 (M.D.

N.C.1975) (three-judge court); Note, The Supreme Court—1973 Term, 88 Harv.L.Rev. 41, 71 (1974).

Whether we apply the language of "strict control." see n.7 *supra,* or balancing, the analysis on these facts will be the same.

**14.** It has been suggested that where in personam jurisdiction over the defendant is available, foreign attachment is per se unconstitutional, *see* Folk and Moyer, *supra,* note 10, 763–68, or least it requires prior notice and hearing, *see* Yale Note, note 10, *supra,* at 1032–34. *But see* Comment, Minn.L.Rev. 396, 401 (1972). That issue is not before us, *see* note 3, *supra,* and we intimate no view as to it.

terial. Pa.R.Civ.Pa. 1255–60. There are no provisions for the exercise of judgment by an official of professional competence to ascertain whether conditions for attachment have been met or whether a valid claim has been pleaded. The affidavit requirement has little utility if it is not given meaningful consideration. Due process requires at a minimum that the sworn statement be presented to an official with sufficient legal competence to make those determinations; the issuance of the writ should be conditioned on approval by such official.[15]

Third, the Pennsylvania attachment rules offer no machinery to indemnify a defendant for damages due to wrongful attachment, which might occur, for example, if he in fact resided in the state or if the claim pleaded is frivolous or perjurious. A constitutionally valid statute must afford such protection, by bond or otherwise.

Fourth, the rules do not provide any means for the defendant promptly to contest the attachment. Given the harm that an attachment could cause a defendant, he should be given an early opportunity to contest the basis for it. Conversely, the opportunity to contest the attachment should not necessitate an immediate trial. We read *Mitchell* and *Di-Chem* to require an opportunity for a prompt hearing after seizure at which the plaintiff would be required to demonstrate at least the probable validity of his claim and, if the defendant puts his residence in issue, that the defendant is in fact a non-resident. *See North Georgia Finishing, Inc. v. Di-Chem, Inc.* 419 U.S. at 607, 95 S.Ct. 719.

Finally, there must be some means not prejudicial to the plaintiff's interests by which the defendant can dissolve the attachment. Filing of a reasonable bond,

substitution of other property, or dissolution of attachment on entry of a general appearance may constitute such means. On this record we decline to pass on the merits of any specific proposal.

### V.

In conclusion, we must emphasize that our decision today does not hold foreign attachment procedures unconstitutional per se. Our concerns are with ex parte procedures which summarily deprive a party of an interest in property, even though temporarily, without notice, an opportunity for a prompt hearing, or other essential safeguards against wrongful seizure. We require only that Pennsylvania provide procedures consistent with fundamental fairness for the respective interests of creditor and debtor alike.

The judgment of the district court will be affirmed.

GIBBONS, Circuit Judge (concurring).

I fully concur in Judge Rosenn's opinion invalidating Pennsylvania's foreign attachment procedures as violative of procedural due process. But while Judge Rosenn's analysis of the several relevant Supreme Court precedents is compelling, the vicissitudinous nature of recent litigation in that Court over the constitutionality of state provisional remedies leads me to believe that any lower court holding grounded thereon may rest on a precarious foundation. That the complexion of the Court itself has changed in the several months since its most recent pronouncement on the subject, *North Georgia Finishing, Inc. v. Di-Chem, Inc.*, 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975), may give us sufficient cause to wonder whether the dawn of yet another new day in the law of

---

15. *Mitchell* and *Di-Chem* might be read to require that a judge approve the seizure. *See North Georgia Finishing, Inc. v. Di-Chem, Inc.*, 419 U.S. at 611, n.3, 95 S.Ct. 719. (Powell, J., concurring). The Court's approval of the Louisiana procedures in *Mitchell* does not necessarily establish judicial participation as a constitutional requisite. The concern clearly is that the official making the required determi-

nations exercise some discretion and possess the necessary professional competence. It is probably true that judicial participation in the writ process affords a greater opportunity for meeting that concern. However, due process is flexible and if that concern can be met by other reasonable means, a state should have the leeway to make the selection.

provisional remedies is not close at hand. *See Mitchell v. W. T. Grant Co.*, 416 U.S. 600, 635–36, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974) (Stewart, J., dissenting). Accordingly, I would reach and decide, as an alternative basis for our holding today, the issue which Judge Rosenn in Part V of his opinion expressly declines to consider. For the reasons set forth below I do not believe that the courts of Pennsylvania, or derivatively the federal courts situated therein, have the raw judicial power to exercise quasi-in-rem jurisdiction over debts owing to the garnishee Dollar Savings Bank.

Although this question has been sparingly litigated it is by no means novel. I made oblique reference to the problem in *Lebowitz v. Forbes Leasing & Finance Corp.*, 456 F.2d 979, 982–83 (3d Cir.) (concurring opinion), *cert. denied*, 409 U.S. 843, 93 S.Ct. 42, 34 L.Ed.2d 82 (1972). More recently it divided this court sitting en banc. *Baker v. Gotz*, 492 F.2d 1238 (3d Cir.) (en banc), *cert. denied*, 417 U.S. 955, 94 S.Ct. 3084, 41 L.Ed.2d 674 (1974), *aff'g mem. by an equally divided court* 336 F.Supp. 197 (D.Del.1971). Essentially, resolution of this question turns on whether one accepts as a limitation on judicial power over property the due process considerations articulated in *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Because I believe *International Shoe* defines limitations on judicial power generally, and because the Pennsylvania foreign attachment procedures purport to authorize judicial acts in excess of these constitutional limitations, they must be struck down.

It may be well at this point to review the salient facts as they pertain to the issue immediately posed by this appeal. All the plaintiffs in the action below are residents of Pennsylvania. Elmer Jonnet individually resides in the Commonwealth, while Jonnet Development Corporation and Jonnel Enterprises, Inc. are Pennsylvania corporations and have their principal places of business there as well. Dollar Savings Bank of the City of New York, garnishee below, is a New York corporation having its principal places of business in that state. Dollar is a foreign corporation not registered to do business in Pennsylvania.

On January 6, 1967 in New York, Dollar entered into a $1,100,000 loan commitment with plaintiffs, who offered to pledge Pennsylvania property as security. It is alleged that Dollar failed to honor this commitment and plaintiffs claimed damages in the amount of $1,300,000. Plaintiffs then brought this action in federal court to attach debts, totaling in excess of $1,350,000, owed to Dollar by two Pennsylvania corporations. The pleadings do not suggest that these debts were incurred within Pennsylvania or that Dollar transacts any business within the Commonwealth.

The analytical point of departure for those cases which have sustained against jurisdictional challenge foreign attachment procedures has traditionally been a quartet of Supreme Court cases reviewing judgments of states courts: *Pennoyer v. Neff*, 95 U.S. 714, 24 L.Ed. 565 (1877); *Harris v. Balk*, 198 U.S. 215, 25 S.Ct. 625, 49 L.Ed. 1023 (1905); *Pennington v. Fourth National Bank*, 243 U.S. 269, 37 S.Ct. 282, 61 L.Ed. 713 (1917); *Ownbey v. Morgan*, 256 U.S. 94, 41 S.Ct. 433, 65 L.Ed. 837 (1921). *See, e. g., Steele v. G. D. Searle & Co.*, 483 F.2d 339 (5th Cir. 1973), *cert. denied*, 415 U.S. 958, 94 S.Ct. 1486, 39 L.Ed.2d 572 (1974). All of these cases were decided before the Supreme Court in *International Shoe* redefined the due process limitations upon the exercise of judicial power over disputes foreign to the forum. All were decided before the Supreme Court in the escheat cases recognized that there are due process limitations upon the power of a state which has permitted a corporation chartered by it to do business, issue securities and incur debts beyond its borders to insist upon the fiction of a local situs for its securities and debts. *Western Union Telegraph Co. v. Pennsylvania*, 368 U.S. 71, 82 S.Ct. 199, 7 L.Ed.2d 139 (1961); *Texas v. New Jersey*, 379 U.S. 674, 85 S.Ct. 674, 13 L.Ed.2d 596 (1964), 380 U.S. 518, 85 S.Ct. 1136, 14 L.Ed.2d 49 (1965). No Supreme Court case has actually considered the

due process issues tendered by this appeal, since the constitutional interpretations which raise them had not yet been made at the time either *Pennoyer v. Neff* or *Ownbey v. Morgan* was decided. And even if it is assumed that the exercise of quasi-in-rem jurisdiction comports with due process, the four cases beginning with *Pennoyer* and ending with *Ownbey* suggest not at all that foreign attachment is within the range of federal judicial remedies.

## I.

The common law recognized three bases for exercising judicial jurisdiction over the person: presence, domicile and consent. *See generally Pennoyer v. Neff, supra.* For many years these bases of jurisdiction were generally sufficient to ensure a convenient forum for a litigant seeking redress for injury to his person or trade. The growth of a technological society spawned the proliferation of interstate corporate entities and increased the mobility of the population, phenomena which threatened the local cause of action by challenging the sufficiency of traditional concepts of in personam adjudicatory authority. The law responded to the social imperative with characteristic ambivalence, meeting the problem not head-on but obliquely, through the use of fiction. The traditional basis of jurisdiction were not rethought and redefined, but were stretched to improbable configurations to accommodate the demands of the new social order. The fiction of implied consent was born first to sustain the exercise of jurisdiction over foreign corporations engaged in business within the state, *St. Clair v. Cox*, 106 U.S. 350, 1 S.Ct. 354, 27 L.Ed. 222 (1882), and was thereafter extended to persons, most recently, in the era of the Model A, to out-of-state motorists, *Hess v. Pawloski*, 274 U.S. 352, 47 S.Ct. 632, 71 L.Ed. 1091 (1927). The fiction of presence gained currency in its application to foreign corporations when the distended notion of consent fell from judicial favor. *Philadelphia & Reading R.R. v. McKibbin*, 243

U.S. 264, 37 S.Ct. 280, 61 L.Ed. 710 (1917). Although resort to these fictions was initially necessary to bridge the gap between the urgent demands of a developing society and an obsolescent theory of law, the perpetuation, indeed the institutionalization of fiction as law in time came under withering attack. *See, e. g.*, Learned Hand's opinion in *Hutchinson v. Chase & Gilbert*, 45 F.2d 139 (2d Cir. 1930). The Supreme Court's response to the clamor was deliberate but decisive. In *International Shoe* the Court abjured ancient dogma and ushered in the modern concepts of jurisdiction.

Although the Supreme Court in *Pennoyer v. Neff* had acknowledged that the limitations on judicial jurisdiction drew content from the due process clauses, until *International Shoe* the Court had permitted jurisdiction to be defined more by reference to common law rules than by probing analysis of constitutional precepts. In dictum that has since acquired the force of law, Chief Justice Stone wrote that, with respect to jurisdiction in personam, the demands of due process "may be met by such contacts . . . with the state of the forum as make it reasonable, in the context of our federal system of government, to require [defense of] the particular suit which is brought there." 326 U.S. at 317, 66 S.Ct. at 158. Ultimately, the exercise of raw judicial power must stand on the twin legs of due process: 1) respect for federal system values and 2) fairness to the parties.

## II.

While it would not literally be error to characterize *International Shoe* as a personal jurisdiction case, there is not a breath of support in the case itself for the proposition that the jurisdictional doctrine it announced applied with diminished force or not at all to the exercise of judicial power over the property of persons foreign to the forum. Were I to consider the question in a vacuum, I could only conclude that any bifurcation of *International Shoe's* jurisdictional doc-

trine would be irrational. Such a position must find support, if anywhere, in the ancient authorities antedating *International Shoe* and not repudiated therein, which recognized a court's plenary power over property within its territorial jurisdiction.

It is worthwhile to preface discussion of the constitutional issue with a brief reference to the history of quasi-in-rem foreign attachment in the federal courts. Without that reference as a benchmark the very limited precedential value of the cases from *Pennoyer v. Neff* to *Ownbey v. Morgan* may escape attention. Although the foreign attachment device has enjoyed a venerable history in the state courts, the experience in the federal courts has been far less illustrious. It existed in Massachusetts, for instance, in colonial times and was continued by the Act of February 28, 1795 [1794] Mass.Acts. ch. 65, which was a substitute for the provincial act of 32 Geo. II, ch. 2. In 1828 it was suggested that by virtue of the Process Act of 1789, ch. 21, § 2, 1 Stat. 93, and the Process Act of 1792, ch. 36, § 2, 1 Stat. 275, the circuit courts of the United States in a diversity case could use the Massachusetts statutory proceeding. Justice Story, at circuit in *Picquet v. Swan*, 19 Fed.Cas. 609 (No. 11,134) (C.C. D.Mass.1828), held that the grant of diversity jurisdiction to the circuit courts in the Judiciary Act of 1789 limited those courts to an exercise of judicial power over persons found within their respective districts. He wrote:

"I cannot judicially say, that the general phraseology of these process acts sought to receive a more extensive interpretation, so as to breakdown or interfere with the policy of the judiciary act of 1789 (chapter 20), founded, as it seems to me to be, in principles of public law, public convenience, and immutable justice. If the state jurisprudence authorizes its own courts to take cognizance of suits against non-resi-dents, by summoning their tenants, attornies, or agents, or attaching their property, whether it be a farm or a debt, or a glove, or a chip, it is not for us to say, that such legislation may not be rightful, and bind the state courts. But when the circuit courts are called upon to adopt the same rule, it ought to be seen, that congress have, in an unambiguous manner, made it imperative upon them." *Id.* at 614.

The Process Acts governed process on the law side. When the Supreme Court adopted Equity Rules from time to time it did not adopt any quasi-in-rem attachment device. *See* 226 U.S. 627 (1912), *as amended*, 281 U.S. 773 (1930), 286 U.S. 570 (1932), 296 U.S. 671 (1935); 17 Pet. lxi (1842); 20 U.S. (7 Wheat.) xvii (1822); Hopkins, Federal Equity Rules (2d ed. 1918). Justice Story's interpretation of the basic grant of lower federal court diversity jurisdiction—that those courts could not, by a quasi-in-rem device, seek to compel persons outside their respective territories to litigate within—continued not only up to the adoption of the Federal Rules of Civil Procedure, but thereafter as well, until 1963. *See Big Vein Coal Co. v. Read*, 229 U.S. 31, 33 S.Ct. 694, 57 L.Ed. 1053 (1913); *Davis v. Ensign-Bickford Co.*, 139 F.2d 624 (8th Cir. 1944). And in the 1963 amendment to rule 4(e) Congress did not, as it might have, grant the district courts extraterritorial process.[1] Instead, it permitted the borrowing of state quasi-in-rem process to the extent only that the state in which the district court sat might exercise it.

The absence of quasi-in-rem jurisdiction in the federal courts in the period between 1789 and 1868, when the fourteenth amendment was adopted is significant in several respects. Because the states were not bound by the due process clause of the fifth amendment, a due process challenge to the device was not

---

1. *Compare, e. g.,* 15 U.S.C. § 77v (Securities Act of 1933); 15 U.S.C. § 78aa (Securities Exchange Act of 1934); 28 U.S.C. § 1655 (lien enforcement); 28 U.S.C. § 2361 (interpleader); Fed.R.Civ.P. 4(f) (100-mile provision for impleader).

likely to arise.[2] The only federal constitutional question that did arise was whether a judgment founded only upon such process was entitled to full faith and credit. To understand the full faith and credit cases one must appreciate that there were two generic types of state statutes purporting to predicate jurisdiction upon the location of property.

The first type of case claimed judicial power to notify the foreign defendant to appear because he had property within the state, and to subject him to an in personam judgment if he did not do so. The Supreme Court held that although the resulting judgment might bind the defendant within the borders of the rendering state, it was not entitled to full faith and credit outside that state or in a federal tribunal. *Boswell's Lessee v. Otis*, 50 U.S. [9 How.] 357, 13 L.Ed. 164 (1850). The second type claimed judicial power only to the extent of the property within the state. The court held that a decree passing title pursuant to such a statutory proceeding, providing the state court obtained jurisdiction over the property by a prejudgment levy, could not be collaterally attacked. The issue arose in *Cooper v. Reynolds*, 77 U.S. [10 Wall.] 308, 19 L.Ed. 931 (1870). That case, although decided after ratification of the fourteenth amendment, involved a state court decree rendered in 1863. It held that if the state court made a prejudgment levy the resulting decree could not be collaterally attacked in another jurisdiction even though publication of the notice of levy to the defendant, prescribed by the state law, was never made, and even though the affidavit supporting the prejudgment levy was defective.

These cases make clear that the concern prior to the adoption of the fourteenth amendment was not fairness, but sovereignty. If a litigant holding an in personam judgment obtained against a non-resident without personal service at-

tempted to enforce it in another jurisdiction, the sovereignty of that other jurisdiction would be offended and the full faith and credit clause did not compel recognition. But if a litigant held title to property as a result of a judgment of the first sovereignty, recognition of that title was not deemed an invasion of the second sovereignty, and the decree commanded full faith and credit. In neither case, however, was the fairness of the first sovereignty's exercise of judicial power considered a relevant factor. And within the territory and courts of the first sovereignty an in personam judgment based on publication rather than service of process might be recognized fully without offending the Federal Constitution.

The fourteenth amendment, however, exposed such judgment to possible challenge even in the territory of the first sovereign. In *Pennoyer v. Neff* Justice Field said:

"Since the adoption of the Fourteenth Amendment to the Federal Constitution, the validity of such judgments may be directly questioned, and their enforcement in the State resisted on the ground that proceedings in a court of justice to determine the personal rights and obligations of parties over whom that court has no jurisdiction do not constitute due process of law." 95 U.S. at 733, 24 L.Ed. 565.

The Oregon statute held invalid in *Pennoyer v. Neff* was of the first generic type. Oregon claimed jurisdiction to compel a general appearance by notice because the defendant owned property in the state, and to enforce the resulting judgment by a post-judgment execution on Oregon property. The Supreme Court said that recognition of the title resulting from such an execution would violate the fourteenth amendment.

*Pennoyer v. Neff* could have been decided upon the narrower sovereignty ground discussed in *Cooper v. Reynolds, supra*, since as in *Cooper* the underlying

---

2. A due process claim might have been, but so far as I have been able to determine apparently was not, asserted in a removed case.

state decree had been rendered prior to the adoption of the fourteenth amendment. The significance of the case for present purposes is that the Court chose to announce, in a case where perhaps the announcement was not absolutely necessary to the decision, that the judicial power of the states is limited by the due process clause of the fourteenth amendment, not merely by the territorial limits of sovereignty. The Court has never at any time since *Pennoyer v. Neff* cast any doubt upon that fundamental position. Fairness, of course, lies at the heart of *International Shoe* and of contemporary due process learning. Even the dicta in *Pennoyer v. Neff*, however, hints at this later development of fairness doctrines, for Justice Field rejects the notion that the courts of a sovereignty have unfettered power to dispose of property within its territory. He suggests that quasi-in-rem jurisdiction may only be exercised in favor of residents of the state to enforce debts owed to such residents by nonresidents. *See* 95 U.S. at 723, 24 L.Ed. 565.

*Harris v. Balk, supra,* is the case from which contemporary proponents of foreign attachment can take the greatest comfort. *See, e. g., Steele v. G. D. Searle & Co., supra* ; *Minichiello v. Rosenberg,* 410 F.2d 117 (2d Cir. 1968) (en banc), *cert. denied,* 396 U.S. 844, 90 S.Ct. 69, 24 L.Ed.2d 94 (1969). In that case a Maryland court garnished Harris, a non-resident debtor, who was temporarily in Maryland. Harris notified Balk, his creditor, who did not appear. The Maryland creditor obtained a consent judgment which Harris paid. Balk then sued Harris in South Carolina and Harris pleaded the Maryland judgment. The South Carolina court held that the judgment was not entitled to full faith and credit because there was no "situs" of the debt in Maryland. The Supreme Court reversed, holding that as long as Balk could have sued Harris in Maryland to enforce the debt, Balk's creditor could garnish the debt in that state. This being so, the Maryland judgment was entitled to full faith and credit. There is no discussion in Justice Peckham's opinion

of the fourteenth amendment and no discussion of Justice Field's suggestion in *Pennoyer v. Neff* that the quasi-in-rem collection device could be utilized only for the protection of residents of the jurisdiction. The plaintiff in the Maryland case was, however, a Maryland resident. Thus it may be that the *Pennoyer v. Neff* limitation was assumed, and to it *Harris v. Balk* added a requirement that for the exercise of quasi-in-rem jurisdiction over intangibles the debt must be one which the nonresident defendant could have enforced in the forum. This requirement arose

> "because of the fact that the plaintiff is really, in such proceeding a representative of the creditor of the garnishee, and therefore if such creditor himself had the right to commence suit to recover the debt in the foreign State his representative has the same right, as representing him, and may garnish or attach the debt, provided the municipal law of the State where the attachment was sued out permits it."

*Harris v. Balk, supra,* 198 U.S. at 226, 25 S.Ct. at 628. The very artificiality of this reasoning suggests that it has not survived the test of "fair play and substantial justice" announced in *International Shoe Co. v. Washington, supra,* 326 U.S. at 320, 66 S.Ct. 154, 90 L.Ed. 95.

*Pennington v. Fourth National Bank, supra,* illustrates a situation in which the exercise of quasi-in-rem jurisdiction undoubtedly comports with contemporary due process. Mrs. Pennington, an Ohio resident, commenced a divorce action against her absconding husband, and at the commencement of the proceeding sequestered his Ohio bank account to secure the payment of alimony. Under later court orders the bank made payments from the account to Mrs. Pennington, ultimately exhausting the account. The defendant husband presented a check for the full amount of the deposit and when it was dishonored, sued the bank. Justice Brandeis in a brief opinion recognized the validity of the orders under which the bank had paid. Clearly

the State of Ohio had a substantial interest in adjudicating the basic dispute— the status of the marriage of one of its residents and the absent defendant's obligation to support her. And it is equally clear that the state had a substantial interest in seizing the assets of the absconding husband before a hearing was held. Thus we may assume that the authority of *Pennington* has survived both the *International Shoe* and the *Sniadach-Fuentes-Mitchell-North Georgia Finishing* developments. But the plaintiffs in our case are not abandoned Pennsylvania wives and the garnishee has not absconded from Pennsylvania. Indeed, it never was there.

A commentator has described *Ownbey v. Morgan, supra*, as "one of the more egregious injustices of modern times." Currie, *Attachment and Garnishment in the Federal Courts*, 59 Mich.L.Rev. 337, 379 (1961). The holding of that case is not directly in point, since the challenge went only to the long-since abandoned Delaware statutory requirement that in a foreign attachment suit the defendant put up "special bail" in order to appear and defend. Because Ownbey was unable to raise special bail, a default judgment was entered which deprived him of any opportunity to defend the action on the merits. But while the holding deals only with "special bail", Justice Pitney's opinion makes clear his lack of doubt as to the constitutionality of the Delaware foreign attachment procedures. Indeed, *Ownbey* significantly departs from Justice Field's position in *Pennoyer v. Neff* that the quasi-in-rem device was available only on behalf of residents of the forum. Justice Pitney said:

> "it is clear that, by virtue of the 'privileges and immunities' clause of § 2 of Art. IV of the Constitution, each State is at liberty, if not under a duty, to accord the same privilege of protection to creditors who are citizens of other States that it accords to its own citizens." 256 U.S. at 109–10, 41 S.Ct. at 437.

It is inconceivable that *Ownbey* would be decided today as it was decided in 1921.

The only other Supreme Court authority bearing on the issues in this case is *McKay v. McInnes*, 279 U.S. 820, 49 S.Ct. 344, 73 L.Ed. 975 (1928), aff'g *per curiam* 127 Me. 110, 141 A. 699 (1918), which summarily upheld Maine attachment procedures against a due process challenge. The case apparently involved use of attachment by a Maine resident against a Maine defendant, and thus did not present an *International Shoe* issue.

The constant in the case law from *Pennoyer v. Neff* to *Ownbey v. Morgan* is that the due process clause limits the exercise of state judicial power even when the state purports to act upon property rather than persons. Since *Pennoyer v. Neff* the Court has never wavered from this constant. The variable is the content of due process. It obviously meant something quite different to Justice Pitney than to Justice Field. For Justice Pitney "due" process was process for which he could discover ancient lineage.

> "A procedure customarily employed, long before the Revolution, in the commercial metropolis of England, and generally adopted by the States as suited to their circumstances and needs, cannot be deemed inconsistent with due process of law . . . ." 256 U.S. at 111, 41 S.Ct. at 438.

The flaw in Justice Pitney's reasoning is that prior to 1868 adoption of the procedure by the states had no due process significance. Justice Field recognized this in *Pennoyer v. Neff*. And in *Sniadach v. Family Finance Corp.*, 395 U.S. 337, 340, 95 S.Ct. 1820, 23 L.Ed.2d 349 (1969), the Supreme Court held that the ancient lineage of a procedural rule did not guarantee its constitutionality under the due process clause.

### III.

Although it can be argued that the content of constitutional process due a litigant defending title to property will vary from that due a litigant defending himself from liability in personam, there is no reason to believe that the Supreme Court presently recognizes such a dis-

tinction. In determining whether there existed a basis of jurisdiction in *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 312–13, 70 S.Ct. 652, 656, 94 L.Ed. 865 (1950), the Court wrote:

"Judicial proceedings to settle fiduciary accounts have been sometimes termed *in rem*, or more indefinitely *quasi in rem*, or more vaguely still, 'in the nature of a proceeding *in rem*.' It is not readily apparent how the courts of New York did or would classify the present proceeding, which has some characteristics and is wanting in some features of proceedings both *in rem* and *in personam*. But in any event, we think that the requirements of the Fourteenth Amendment to the Federal Constitution do not depend upon a classification for which the standards are so elusive and confused generally and which, being primarily for state courts to define, may and do vary from state to state. Without disparaging the usefulness of distinctions between actions *in rem* and those *in personam* in many branches of law, or on other issues, or the reasoning which underlies them, we do not rest the power of the State to resort to constructive service in this proceeding upon how its courts or this Court may regard this historic antithesis. It is sufficient to observe that, whatever the technical definition of its chosen procedure, the interest of each state in providing means to close trusts that exist by the grace of its laws and are administered under the supervision of its courts is so insistent and rooted in custom as to establish beyond doubt the right of its courts to determine the interests of all claimants, resident or nonresident, provided its procedure accords full opportunity to appear and be heard."

This principle was reaffirmed and made more explicit in *Hanson v. Denckla*, 357 U.S. 235, 245–46, 78 S.Ct. 1228, 1235, 2 L.Ed.2d 1283 (1958) (footnotes omitted):

"Appellants charge that this judgment is offensive to the Due Process Clause of the Fourteenth Amendment because the Florida court was without jurisdiction. There is no suggestion that the court failed to employ a means of notice reasonably calculated to inform nonresident defendants of the pending proceedings, or denied them an opportunity to be heard in defense of their interests. The alleged defect is the absence of those 'affiliating circumstances' without which the courts of a State may not enter a judgment imposing obligations on persons (jurisdiction *in personam*) or affecting interests in property (jurisdiction *in rem* or *quasi in rem*). While the *in rem* and *in personam* classifications do not exhaust all the situations that give rise to jurisdiction, they are adequate to describe the affiliating circumstances suggested here, and accordingly serve as a useful means of approach to this case."

In short, the same limitations of fundamental fairness apply to any exercise by the state of judicial power, whether that exercise be denominated in rem, quasi-in-rem or in personam. One of those limitations, considerably refined since Justice Pitney's time, is the *International Shoe* rule.

The minimum contacts analysis engendered by *International Shoe* has most often been made in cases involving in personam jurisdiction. That that is so should not be surprising, for *International Shoe* was a personal jurisdiction case. But cases subsequent to *International Shoe*, having made such an analysis and having resolved that the requisite contacts for the constitutional exercise of jurisdiction in personam are not present, have sometimes balked at drawing the next logical and seemingly inescapable conclusion: that the state is entirely without adjudicatory authority over the dispute. Instead, these courts have embarked upon an excursion into fictional situs of intangibles. *See, e. g., Steele v. G. B. Searle & Co., supra; Minichiello v. Rosenberg, supra.* Why does such fiction justify an exercise of quasi-in-rem jurisdiction when there concededly are insufficient local contacts to justify in personam jurisdiction? The Supreme

Court has long since abandoned the notions of sovereignty which once confined state process to state borders. *See, e. g., Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940). The Court has made a local contacts analysis with respect to jurisdiction to tax intangibles. *State Tax Commission v. Aldrich*, 316 U.S. 174, 62 S.Ct. 1008, 86 L.Ed. 1358 (1942); *Curry v. McCanless*, 307 U.S. 357, 373–74, 59 S.Ct. 900, 83 L.Ed. 1339 (1939). It has made a local contacts analysis with respect to jurisdiction to adjudicate trust obligations. *Mullane v. Central Hanover Bank & Trust Co., supra*, 339 U.S. at 311–313, 70 S.Ct. 652, 94 L.Ed. 865. In light of these developments a fictional situs of intangibles is no substitute, in a quasi-in-rem case, for a minimum contacts analysis. The better reasoned authorities which have considered the matter have made such an analysis.

In *Atkinson v. Superior Court*, 49 Cal.2d 338, 316 P.2d 960 (1957), *appeals dismissed and cert. denied per curiam*, 357 U.S. 569, 78 S.Ct. 1381, 2 L.Ed.2d 1541 (1958), for example, Judge Traynor stated that since a person might be forced personally to appear (the very purpose of the procedure) when a state asserted quasi-in-rem jurisdiction, a minimum contacts analysis should be made to determine whether forcing such an appearance was consistent with due process.

A quite significant group of cases presenting a closely analogous issue arose as a result of the attachment procedure sanctioned by the New York Court of Appeals in *Seider v. Roth*, 17 N.Y.2d 111, 269 N.Y.S.2d 99, 216 N.E.2d 312 (1966). In that case the plaintiff, a New York resident, was involved in an automobile accident in Vermont with a resident of Canada. The court held that the plaintiff could obtain quasi-in-rem jurisdiction in New York by attaching an automobile insurance liability policy issued in Canada by an insurance company which was doing business, and hence minimally present, in New York. The court reasoned that the obligation of the insurer to defend and indemnify was a debt which could be attached wherever the debtor could be found. It reconsidered the problem in light of a constitutional objection in *Simpson v. Loehmann*, 21 N.Y.2d 305, 310–11, 287 N.Y.S.2d 633, 636–37, 234 N.E.2d 669, 671 (1967), and relying on *Harris v. Balk* held the procedure to be constitutional. In *Minichiello v. Rosenberg*, 410 F.2d 106 (2d Cir. 1968), *aff'd on rehearing en banc*, 410 F.2d 117, *cert. denied*, 396 U.S. 844, 90 S.Ct. 69, 24 L.Ed.2d 94 (1969), the *Seider v. Roth* quasi-in-rem procedure came before the Second Circuit. Judge Friendly noted that the *Seider* decision had judicially created a direct action statute. Analyzing the interests and contacts involved, he concluded that the Supreme Court probably would uphold such a statute enacted for the benefit of New York residents, or for the benefit of non-residents injured in New York. 410 F.2d at 110. On rehearing en banc, Judge Friendly dealt directly with the due process issue arising from the exercise of quasi-in-rem jurisdiction. He concluded that the exercise of such jurisdiction was justified by *Harris v. Balk*. Three judges dissented, distinguishing *Harris v. Balk*, and urging that there were insufficient New York contacts to sustain jurisdiction. *See* 410 F.2d at 113–17 (Anderson, J., dissenting from the panel decision), and 410 F.2d at 120–22 (Anderson, Lumbard and Moore, JJ., dissenting from the en banc decision). The majority opinions in *Minichiello*, however, rest at least in part on the fact that the *Seider* procedure is available only for New York resident plaintiffs or for New York accidents. These limitations were confirmed in *Farrell v. Piedmont Aviation, Inc.*, 411 F.2d 812, 816–17 (2d Cir.), *cert. denied*, 396 U.S. 840, 90 S.Ct. 103, 24 L.Ed.2d 91 (1969). Judge Friendly noted that without these limitations the *Seider* procedure would be of doubtful constitutionality and that "[t]he constitutional doubt arises from New York's lack of meaningful contact with the claim . . . ." 411 F.2d at 817. *Cf. United States v. First National City Bank*, 379 U.S 378, 381, 85 S.Ct. 528, 13 L.Ed.2d 365 (1965), in which the Court,

sustaining exercise of quasi-in-rem jurisdiction, noted that the result might have been different if the defendant whose account in Citibank had been attached had not also been subject to in personam jurisdiction under the New York long arm statute. Quite clearly, the Second Circuit in *Farrell* rejected the view that the presence of a debtor within the jurisdiction is sufficient, without other minimum contacts, to sustain a compelled general appearance by use of a quasi-in-rem attachment. As developed in Part V of this opinion, I disagree with the Second Circuit that the plaintiff's residence is by itself sufficient to meet fourteenth amendment fairness requirements in the foreign attachment context.

### IV.

As discussed above, the principal authority for the foreign attachment in this case is *Harris v. Balk,* which permitted attachment of a debt owing creditor in the jurisdiction in which the debtor was found. The predicate for the exercise of *quasi-in-rem* jurisdiction in that case was the fictional assignment of the situs of the debt to the location of the debtor. Pennsylvania has perpetuated the fictional assignment of a situs to intangible property in its foreign attachment procedures. Pa.R.Civ.P. 1260(b) provides that "A mortgage . . . owned by a defendant may be attached by serving as garnishee the owner of the real property subject thereto." The question is whether the due process clause is satisfied when a fictional situs is substituted for minimum contacts analysis as a basis for justifying exercises of raw judicial power. I think it is plain that due process is not satisfied under such circumstances. The reasons for my belief can best be illustrated by analogy.

Consider a state law which purports to fix such a situs there for corporations chartered under state law but which have their business elsewhere and have issued intangibles (e. g., stock certificates) elsewhere. As a metaphysical exercise it may be asserted that since the very existence of the corporations is dependent upon state law, state law should be regarded as supreme in defining the situs of intangibles resulting from such corporate existence. But the state has permitted the corporations to stray far from its boundaries, and to issue intangibles without its jurisdiction. New Jersey once contended that since it issued a corporation's charter, it could determine the situs of intangibles issued by such corporation, and that it alone could escheat those intangibles in an in rem proceeding. The Supreme Court rejected this contention in *Texas v. New Jersey, supra.* Justice Black's opinion recognized that a local contacts analysis suggested by *International Shoe* and *Mullane v. Central Hanover Bank & Trust Co.* would be unworkable in escheat cases, because more than one jurisdiction might have contacts minimally sufficient to support the exercise of adjudicatory authority over the dispute. Nevertheless, he rejected the fictionalized situs approach, announcing instead a rule favoring the state of the last known address of the creditor. There is no more justification for recognizing state notions of fictionalized situs of corporate intangibles in a *quasi-in-rem* case than in an escheat case. Indeed, the state's interest in a fictionalized local situs is stronger in the escheat case, where it is at least acting in its own interest rather than on behalf of a private litigant. While it can thus be seen that the argument in favor of applying fictional situs analysis to cases involving corporate intangibles is weak, the case supporting its application to mortgage debts is still weaker. That the corporation is a creature of state law provides at least some discernible interest in perpetuating legal fictions to ensure that the power to adjudicate disputes arising from corporate acts will be preserved. In the case of foreign attachment of a mere debt, however, even that tenuous link to a legitimate governmental interest is missing.

### V.

Analysis of the constitutionality of the Pennsylvania foreign attachment proce-

dures only begins, not ends, with the conclusion that *International Shoe* provides the frame of reference for determining the scope of judicial power over property as well as persons. The question remains whether under the standards set forth in that case Pennsylvania could, consistent with due process, authorize its courts to exercise jurisdiction over the property of Dollar.

The record below does not suggest that Dollar is doing business in Pennsylvania, or that it has even transacted any business within the Commonwealth at any time. The parties have agreed that state courts would not be competent to hear this case under the Pennsylvania long-arm statute. The jurisdictional question thus turns upon whether the plaintiffs' residence in Pennsylvania is by itself sufficient under *International Shoe* and the fourteenth amendment to sustain an assertion of judicial power over the dispute. I do not believe that *International Shoe* supports such a result.

*International Shoe* posited twin limitations upon the scope of state judicial power. First, out of respect for values of federalism, the due process clause was held to forbid a state to exercise its adjudicatory authority in a manner that would encroach upon the sovereignty of a sister state. A state must have some palpable interest—rationally connected with public policy—in adjudicating a dispute within its borders for jurisdiction to be lawfully acquired. The most apparent interest a state has in applying its judicial power is in regulating the conduct of persons within its territory. But state interests sufficient under the due process clause to sustain exercises of judicial jurisdiction may take many other forms as well, and whenever one or more of these factors is present, the forum's interest in allowing suit to be brought there may be adequate to satisfy the demands of federalism. Although some other sovereign state may have a superior interest in having the controversy finally adjudged in its courts, our system of federalism has recognized that such conflicts between states will often arise,

and has concluded that as long as the forum's interest in opening its courts to the litigants is of due process dimensions, the sovereign rights of a sister state are not unconstitutionally abridged.

The second jurisdictional limitation interposed by the due process clause focuses upon the parties and the burdens associated with litigating in a particular forum. This limitation upon judicial power prevents a state of a plaintiff's choosing from coercing defense of a suit in a forum which, because of its remoteness from defendant's residence and from witnesses and proof, would be fundamentally unfair. This limitation is bound up in notions of fair play and substantial justice, and not at all in sovereignty.

These two limitations interact conjunctively. Thus a state may exercise its jurisdiction in a manner consistent with values of federalism, but if that exercise would nevertheless be fundamentally unfair to the defendant, the power is void. Similarly, it may not be unfair to subject a defendant to suit in a particular state, but if that state lacks the requisite contacts with the parties or the subject matter, its assumption of jurisdiction would impermissibly intrude upon another sovereign's right to have its courts adjudicate disputes of interest to it.

I must voice my doubt that Pennsylvania's foreign attachment procedures, which authorize its courts to assert jurisdiction over two debts of Dollar, can comfortably rest on either, much less both, pillars of due process established in *International Shoe*. That all the plaintiffs in this case are Pennsylvania residents does not, in my view, create in the Commonwealth a sufficiently substantial interest in adjudicating the matter to overcome the sovereign objections of another state having a significantly closer connection with the subject matter of the Jonnet-Dollar dispute. Although a rule developed at common law and carried unquestioningly forward to this day is that a sovereign power always has jurisdiction to entertain suit *against* a person physically present within its bor-

ders, the same rule does not apply in favor of suits *by* resident plaintiffs. Indeed, I believe that the common law viewed the right of the state to exercise judicial power over any defendant within its territory as an incident of sovereignty itself. Moreover, recognizing presence as a jurisdictional basis was and remains necessary to assure that each person within the country can be sued in at least one place. These considerations which make the assumption of jurisdiction by a state having no connection with the subject matter of a dispute acceptable from the perspective of sovereignty and federalism simply do not apply in the resident plaintiff context. In this case the defendant resides in New York. All of the salient events in this controversy occurred outside Pennsylvania. The Commonwealth's only demonstrable interest is to provide a convenient forum for resolving a dispute that arose elsewhere. While this interest can be regarded as more than nominal, I believe that Pennsylvania's arrogation of jurisdiction in the face of New York's clearly superior interest would be an affront to the latter's sovereignty, and hence inconsistent with the values of federalism *International Shoe* endeavored to safeguard. *Cf. United States v. First National City Bank, supra.*

Quite apart from concerns with federalism, it would be fundamentally unfair, in the posture of this case, to force Dollar either to defend the action in Pennsylvania or to default. In discussing the constitutional power of courts to render in personam judgments against a defendant, the Court in *International Shoe* remarked:

> Historically the jurisdiction of courts to render judgment *in personam* is grounded on their de facto power over the defendant's person. Hence his presence within the territorial jurisdiction of a court was prerequisite to its rendition of a judgment personally binding him. *Pennoyer v. Neff,* 95 U.S. 714, 733, 24 L.Ed. 565. But now that the *capias ad respondendum* has given way to personal service of summons or other form of notice, due

process requires only that in order to subject a defendant to a judgment *in personam,* if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 343, 85 L.Ed. 278.

326 U.S. at 316, 66 S.Ct. at 158. What is significant about this language is its focus upon the qualitative nature of defendant's contacts with the forum seeking to exercise jurisdiction, to the exclusion of analysis of plaintiff contacts. This excerpt plainly requires that a defendant not present within the state "have certain minimum contacts with it such that the maintenance of the suit does not offend" due process. In this case the record does not disclose that Dollar has had any contact with Pennsylvania. Nor does *International Shoe* in any way suggest that the quality of plaintiff's contacts with the forum state is at all relevant for jurisdictional purposes, or at least that they can be completely substituted for defendant contacts. Simply stated, plaintiff contacts cannot cure a jurisdictional defect that derives from a lack of defendant contacts with the forum. Were this not the case *International Shoe* itself would not have been decided. In that case the State of Washington sued defendant in its own courts. If plaintiff's residence alone in the forum state satisfied the demands of due process, a fortiori the courts would have jurisdiction when the state sued in its own name. Notwithstanding the symmetry of the plaintiff's relationship with the forum, however, the Court engaged in the due process analysis which focuses upon the nature and quality of defendant's contacts there.

Although jurisdictional theory has evolved beyond its nascency beginnings in *International Shoe,* the Supreme Court has never wavered in its belief that the fourteenth amendment requires that a defendant maintain certain minimum contacts with a state before he can

be subjected to suit there. The language to this effect in *International Shoe* has been quoted with approval in several subsequent cases. *See, e. g., Travelers Health Association v. Virginia ex rel. State Corp. Commission,* 339 U.S. 643, 648, 70 S.Ct. 927, 94 L.Ed. 1154 (1950); *McGee v. International Life Insurance Co.,* 355 U.S. 220, 222, 78 S.Ct. 220, 2 L.Ed.2d 223 (1957). That this rule operates to bar suit even in a forum that is not unduly burdensome to the defendant was made plain in *Hanson v. Denckla, supra,* 375 U.S. at 251, 78 S.Ct. at 1238, where Chief Justice Warren said:

> However minimal the burden of defending in a foreign tribunal, a defendant may not be called upon to do so unless he has had the "minimal contacts" with that State that are a prerequisite to its exercise of power over him. See *International Shoe v. Washington,* 326 U.S. 310, 319, 66 S.Ct. 154, 159, 90 L.Ed. 95.

Thus Pennsylvania's assertion of jurisdiction over the property of a creditor having no contacts with the Commonwealth cannot be defended in this case on the ground that Pennsylvania's proximity to New York does not make defense there by a wealthy bank fundamentally unfair. The Supreme Court has made the contrary determination.

It is not necessary to decide whether in all cases it would be fundamentally unfair to subject a defendant who has no connection with the state to jurisdiction at the place of plaintiff's residence. Language in the Supreme Court's most recent pronouncement on the subject strongly suggests that such efforts would be uniformly unconstitutional. *See Hanson v. Denckla, supra,* 357 U.S. at 250–55, 78 S.Ct. 1228. But it may be that in some tort cases, for example, a state's interest in facilitating plaintiff recovery so that victims or their dependents do not become public wards may be so great that the assertion of jurisdiction based on plaintiff's residence alone does not violate due process. *Cf. Minichiello v. Rosenberg, supra; Farrell v. Piedmont Aviation, Inc., supra.* Manifestly, however, this is not such a case. It involves a garden variety commercial litigation. There exists no superseding governmental interest in local adjudication to which a court should be permitted to subordinate the defendant's interest in receiving a forum proximate to its activities. Because Pennsylvania's foreign attachment rules purport to authorize courts within its territory to exercise jurisdiction in excess of constitutional limitations, they must be declared null and void.

## VI.

Up to this point I have assumed that Pennsylvania courts could constitutionally employ the foreign attachment device against the property of persons or corporations having sufficient contacts with the Commonwealth to satisfy the requirements of *International Shoe.* Thus the scope of jurisdiction quasi-in-rem is coextensive with jurisdiction in personam. Pennsylvania's foreign attachment procedures would thus be transformed pro tanto into a domestic attachment device. But because Pennsylvania has abolished attachment of property of persons not foreign to the forum, *see* Pa.R. Civ.P. 1480(a), the effect would be to discriminate against non-residents by permitting their property to be attached while the property of residents is shielded from seizure.

The discriminatory effect of the Pennsylvania foreign attachment procedures as thus applied obviously presents an equal protection issue. Conceding that the de facto classification may withstand constitutional scrutiny if it has a conceivably rational basis, *Morey v. Doud,* 354 U.S. 457, 77 S.Ct. 1344, 1 L.Ed.2d 1485 (1957), I believe that it is wholly arbitrary and thus void. The purpose of prejudgment attachment in general and prejudgment foreign attachment in particular is to prevent a potentially liable party from absconding with or secreting assets which may eventually be required to satisfy a judgment. The discriminatory treatment of non-resident property-holders can be upheld, if at all, only on the basis that non-residents are more

likely than residents to remove or conceal assets within the court's jurisdiction. Since neither proof nor inference supports such a conclusion, the classification is irrational.

In summary, I believe that the due process clause prevents Pennsylvania courts from exercising jurisdiction over the property of persons not having contacts minimally sufficient to satisfy the requirements of *International Shoe.* And because even as applied the Pennsylvania foreign attachment procedures violate the equal protection clause, I do not believe that foreign attachment any longer has a place in Pennsylvania law.

Gee, Circuit Judge, dissented and filed opinion.