ALCHEMIE INTERNATIONAL, INC., a New Jersey Corporation, Plaintiff,

v.

METAL WORLD, INC., a Missouri Corporation, Defendant.

Civ. No. 81–142.

United States District Court, D. New Jersey.

Sept. 23, 1981.

Thomas E. Primavera, Primavera & Mullaney, Tinton Falls, N. J., for plaintiff.

Jeffrey J. Greenbaum, Sills, Beck, Cummis, Radin & Tischman, Newark, N. J., for defendant.

## OPINION

LACEY, District Judge.

This is a breach-of-contract action brought by Alchemie International, Inc. (Alchemie), a New Jersey corporation, against Metal World, Inc. (Metal World), a Missouri corporation with its principal place of business in East St. Louis, Illinois. Metal World brings the present motion to dismiss the complaint for lack of *in personam* jurisdiction. For the reasons set forth below, this motion will be denied.

### I

In brief, the complaint alleges that on February 15, 1980, Alchemie and Metal World executed a contract under which Metal World agreed to sell and Alchemie agreed to buy approximately 34,993 pounds of molybdenum oxide material containing not less than 58.14% molybdenum oxide and no more than certain amounts of specified impurities. The purchase price was $275,-683.59, F.O.B. East St. Louis. Among other conditions precedent to the sale, Metal World was to produce a certificate of analysis and weight from Ledoux and Company (Ledoux), a New Jersey firm. The complaint charges that Alchemie has performed its obligations under the agreement, including payment of the purchase price, but that Metal World's tendered molybdenum oxide materially breached the contract because it failed to meet the agreed upon quality and quantity specifications. Plaintiff asserts that it timely rejected (or revoked acceptance of) the material tendered by Metal World, and it now seeks the purchase price, "additional direct costs," and attorneys fees.

In support of its motion to dismiss, Metal World has submitted the affidavits of its president, Richard Becker, and its vice-president, Stanley Plocker. In opposition, Alchemie has put in the affidavits of Kevin McKenna, its president, Thomas Primavera, its counsel, and Samuel Ardinto, an employee of another New Jersey molybdenum purchaser, who asserts that his company has had certain dealings with Metal World in the past.

The facts on which there is no dispute are as follows. Prior to the February 15, 1980, contract at issue here, there had been an earlier agreement between the parties in January 1980 that had been performed to the satisfaction of both Alchemie and Metal World. McKenna admits that he cannot recall who initiated the first contact that led to this agreement. Affidavit of Kevin D. McKenna ¶ 3 (Mar. 30, 1981) [hereinafter McKenna Affidavit]. The contract, similar to the one underlying the present action, was prepared in Alchemie's offices in New Jersey and mailed to defendant in Illinois. *Id.*

Shortly after the initial contract, McKenna was contacted by Plocker, who offered a second shipment of molybdenum oxide; this offer became the basis of the February 15, 1981, agreement on which Alchemie now sues. *Id.* ¶ 5. The contract was again prepared by McKenna in New Jersey and mailed to Plocker, presumably in Illinois. *See id.* In addition to the terms related above, the contract provided that payment would be made following presentation of the certification of weight and analysis from Ledoux, *id.* ¶ 6, and that the contract

would be construed in accordance with the laws of New Jersey, *id.* ¶ 3.[1]

The analysis was duly performed by Ledoux in New Jersey. *Id.* ¶ 6. Following receipt of proper documentation, Alchemie directed its bank, located in New Jersey, to satisfy the Metal World invoice by direct wire transfer. Alchemie asserts that all funds used to satisfy the invoice originated in New Jersey, *id.* ¶¶ 4, 7; this point is, however, apparently disputed by Metal World. *See* note 36 *infra.*

Immediately following consummation of its contract with Metal World, Alchemie sold the molybdenum oxide to Treibacher, USA in New York, which in turn sold it to North American Metallurgical Corp. in New Jersey, which sold it to Washington Steel Corp. in Pennsylvania, which ultimately rejected the material for failure to comply with the Ledoux certificate. *Id.* ¶ 8. Metal World asserts, without contradiction, that none of the molybdenum oxide tendered to Alchemie ever entered New Jersey. Affidavit of Stanley J. Plocker ¶ 3 (Mar. 16, 1981) [hereinafter Plocker Affidavit].

Metal World admits, in connection with this transaction, "the mailing of certain papers to the District [of New Jersey] and certain telephone conversations to or from the District." *Id.* ¶ 4. However, it insists, "At no time did any representative of Metal World, Inc. enter the State of New Jersey in connection with this transaction." *Id.* ¶ 3. Metal World's sole place of business is in East St. Louis and "it maintains no offices or personnel in New Jersey, nor does it conduct any active form of business within that District." *Id.* ¶ 2.

In addition to the foregoing, plaintiff makes several assertions, two of which Metal World disputes. First, Alchemie states that it first learned of Metal World from Associated Cargo of New Jersey (Associated), which was apparently engaged in certain assaying work for Metal World. McKenna Affidavit ¶ 2. From this, Alche-

mie argues that Associated may be an agent of Metal World. Plaintiff's Brief at 1. Metal World strenuously disputes this characterization, stating that it knew of Associated as Associated Cargo Service Co., Ltd., of New York, and that although Metal World first learned of Alchemie from representatives of Associated, Associated "is not authorized to solicit business or otherwise act for Metal World, Inc." Affidavit of Richard Becker ¶ 4 (Apr. 15, 1981) [hereinafter Becker Affidavit].

Second, Alchemie contends that Ledoux and Company is also an agent of Metal World, "at least for this transaction." Plaintiff's Brief at 2, 6. Metal World admits that it has had dealings with Ledoux, but asserts that these all took place with Ledoux' Illinois agent, in Illinois. Affidavit of Stanley J. Plocker ¶ 2 (Apr. 15, 1981) [hereinafter Second Plocker Affidavit]. Metal World does admit, however, sending checks for Ledoux' services to Ledoux' New Jersey office, *id.* ¶ 3, although Metal World also contends that the Ledoux analysis was made prior to initiation of the present transaction with Alchemie. Defendant's Reply Brief at 3. In addition, Metal World flatly states that Ledoux "is not an agent of Metal World, Inc. It is not authorized to solicit business or otherwise act for Metal World, Inc." Second Plocker Affidavit ¶ 5.

Finally, neither the Ardinto nor Primavera affidavit is contested by Metal World. The affidavit of Samuel Ardinto indicates that during 1978 and 1979, while working for M & R Refractory Metals (M & R), a New Jersey corporation, he had "several contacts" with Metal World which resulted in M & R purchasing molybdenum from Metal World. Affidavit of Samuel Ardinto ¶ 2 (May 8, 1981) [hereinafter Ardinto Affidavit]. A subsequent check of M & R's records shows that the sales were actually through third parties, one of which was a domiciliary of Colorado, another a domiciliary of Florida. *Id.* ¶ 3.

---

1. As well, paragraph 9 of the contract provides that any controversy arising under the agreement shall be "settled by arbitration in the City of New York in accordance with the Arbitra-

tion Laws of the State of New York and the Rules then obtaining of the American Arbitration Association." Contract ¶ 9, *attached to* Affidavit of Stanley J. Plocker (Mar. 16, 1981).

The affidavit of Thomas Primavera, Alchemie's counsel, states that he attended depositions of Stanley Plocker in litigation related to the present action, and that Plocker admitted Metal World did business "more than once" with M & R during 1978 and 1979. Affidavit of Thomas Primavera ¶ 2 (Apr. 29, 1981) [hereinafter Primavera Affidavit]. In addition, the Primavera Affidavit asserts that Plocker also admitted during deposition that Ledoux assayed, at its New Jersey plant, at least five other lots of molybdenum oxide for Metal World at about the time it assayed the lot destined for sale to Alchemie. *Id.* ¶¶ 3–4.

## II

Under rule 4 of the Federal Rules of Civil Procedure, the propriety of service of process in this diversity action, and thus the validity of *in personam* jurisdiction, is determined by looking to the law of the State of New Jersey. Fed.R.Civ.P. 4(d)(7), 4(e).[2] *Bernardi Bros. v. Pride Manufacturing, Inc.*, 427 F.2d 297, 298–99 (3d Cir. 1970); *W. A. Kraft Corp. v. Terrace on the Park, Inc.*, 337 F.Supp. 206, 206–07 (D.N.J.1972). *See Thos. P. Gonzalez Corp. v. Consejo Nacional de Produccion de Costa Rica*, 614 F.2d 1247, 1250 (9th Cir. 1980); *Lakeside Bridge & Steel Co. v. Mountain State Construction Co.*, 597 F.2d 596, 598 (7th Cir. 1979), *cert.*

*denied*, 445 U.S. 907, 100 S.Ct. 1087, 63 L.Ed.2d 325 (1980); *Washington v. Norton Manufacturing, Inc.*, 588 F.2d 441, 444 (5th Cir.), *cert. denied*, 442 U.S. 942, 99 S.Ct. 2886, 61 L.Ed.2d 313 (1979); *Arrowsmith v. UPI*, 320 F.2d 219, 223 (2d Cir. 1963); 2 *Moore's Federal Practice* §§ 4.32[1], at 4–342 n.2, 4.32[2], at 4–351 to –52, 4.41–1[1], at 4–424 to –25 (perm.rev.ed.1980); 4 C. Wright & A. Miller, *Federal Practice and Procedure* § 1075, at 309, 313–14 (1969). Rule 4:4–4(c)(1) of the New Jersey Civil Practice Rules [3] permits service on nonresident defendants "to the uttermost limits permitted by the United States Constitution," *Avdel Corp. v. Mecure*, 58 N.J. 264, 268, 277 A.2d 207 (1971); thus the State's long-arm rule is limited only by the due process constraints of the fourteenth amendment. *DeJames v. Magnificence Carriers, Inc.*, 654 F.2d 280 at 283–84 (3d Cir. 1981). Whether this court's exertion of jurisdiction over the person of defendant would exceed these bounds is, of course, a question of federal law, and state authorities are not controlling. *Woods v. Holy Cross Hospital*, 591 F.2d 1164, 1171 (5th Cir. 1979); *Scanapico v. Richmond, F. & P. R. Co.*, 439 F.2d 17, 19 (2d Cir. 1970); *Partin v. Michaels Art Bronze Co.*, 202 F.2d 541, 543 (3d Cir. 1953).

**2.** Rule 4 provides in part:
  (d) Summons: Personal Service.... Service shall be made as follows:
    ....
    (7) [I]t is also sufficient if the summons and complaint are served in the manner prescribed ... by the law of the state in which the district court is held for the service of summons or other like process upon any such defendant in an action brought in the courts of general jurisdiction of that state.
  (e) Same: Service Upon Party Not Inhabitant of or Found Within State.... Whenever a statute or rule of court of the state in which the district court is held provides ... for service of a summons, or of a notice, or of an order in lieu of summons upon a party not an inhabitant of or found within the state, ... service may ... be made under the circumstances and in the manner prescribed in the statute or rule.
*See* 2 *Moore's Federal Practice* § 4.41–1[1], at 4–423 (perm.rev.ed.1980) ("Rule 4(e), supplemented by Rule 4(d)(7), as amended in 1963,

contemplates that service in a federal action may be made pursuant to [state long-arm] statutes").

**3.** Rule 4:4–4 provides:
  Service of summons, writs and complaints shall be made as follows:
  (c) Corporations, Partnerships and Associations
  (1) Corporations. Upon a domestic or foreign corporation, by serving, in the manner prescribed in paragraph (a), [but if] it appears ... that after diligent inquiry and effort personal service cannot be made upon any of the foregoing and if the corporation is a foreign corporation, then, consistent with due process of law, service may be made by mailing, by registered or certified mail, return receipt requested, a copy of the summons and complaint to a registered agent for service, or to its principal place of business, or to its registered office.
  N.J.Civ.Prac.R. 4:4–4(c)(1).

The starting point for this constitutional inquiry is *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), in which the Supreme Court announced that

> due process requires only that in order to subject a defendant to a judgment *in personam*, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice."

*Id.* at 316, 66 S.Ct. at 158 (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 342, 85 L.Ed. 278 (1940)).[4] General principles aside, however, *International Shoe* is of little help resolving individual questions of jurisdiction,[5] except insofar as it jettisoned earlier theories of constructive presence and implied consent for determining personal jurisdiction [6] and as it suggested application of different standards, qualitatively and quantitatively, depending on whether an asserted claim is "contact" related.

Of greater aid here is *McGee v. International Life Insurance Co.*, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957). In *McGee* a nonresident insurance company mailed a reinsurance certificate to a California resident in California and offered to continue his insurance. The California resident accepted the offer and thenceforth mailed his premiums from California to the defendant in Texas. On these facts the Supreme Court held that the insurance contract between the parties had "substantial connection" with California so as to render the insurance company—which had no other contact with California—subject to jurisdiction in that state:

> It is sufficient for purposes of due process that the suit was based on a contract which had a substantial connection with that State.... The contract was delivered in California, the premiums were mailed there and the insured was a resident of that State when he died. It cannot be denied that California has a manifest interest in providing effective means of redress for its residents when their insurers refuse to pay claims.

*Id.* at 223, 78 S.Ct. at 201.[7] In reaching this result the Court noted that, with increasing

---

**4.** For the evolution of the various doctrines of *in personam* jurisdiction, see Hazard, *A General Theory of State Court Jurisdiction*, 1965 Sup. Ct.Rev. 241 (1965); Kurland, *The Supreme Court, the Due Process Clause and the in Personam Jurisdiction of State Courts*, 25 U.Chi.L. Rev. 569 (1958). *See generally Developments in the Law—State Court Jurisdiction*, 73 Harv. L.Rev. 909 (1960).

In resolving the present question, it is important to recognize that this case does not involve whether there are sufficient contacts by a foreign corporation to support *in personam* jurisdiction in a suit on a claim unrelated to those contacts. *Perkins v. Benguet Consolidated Mining Co.*, 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952). In such a case, a foreign corporation's activities within the forum must be *"fairly extensive* before the burden of defending a suit there may be imposed upon it without offending 'traditional notions of fair play and substantial justice.'" *Ratliff v. Cooper Labs., Inc.*, 444 F.2d 745, 748 (4th Cir. 1971) (emphasis in original) (quoting F. James, *Civil Procedure* 640 (1965)). *See* von Mehren & Trautman, *Jurisdiction To Adjudicate: A Suggested Analysis*, 79 Harv.L.Rev. 1121, 1142–44 (1966). Instead, we deal here with whether Metal World's contacts justify jurisdiction *in personam* where the claim is based on a contract that had, as will appear, both in its formulation and its breach, New Jersey impact.

**5.** This is hardly surprising: "It is evident that the criteria by which we mark the boundary line between those activities which justify the subjection of a corporation to suit, and those which do not, cannot be simply mechanical or quantitative." *International Shoe Co. v. Washington*, 326 U.S. 310, 319, 66 S.Ct. 154, 159, 90 L.Ed. 95 (1945).

**6.** *See* Currie, *The Growth of the Long Arm: Eight Years of Extended Jurisdiction in Illinois*, 1963 Ill.L.F. 533, 536; Comment, *Federalism, Due Process, and Minimum Contacts: World-Wide Volkswagen Corp. v. Woodson*, 80 Colum.L.Rev. 1341, 1343 (1980) [hereinafter Columbia Comment].

**7.** California's interest in providing a forum for its resident insured was manifested by the California Unauthorized Insurers Process Act, Cal. Ins.Code §§ 1610–20 (Deering 1950), pursuant to which the defendant in *McGee* was served. Significantly, this legislation was enacted *after* the parties had entered the contract at issue in the case. *McGee v. International Life Ins. Co.*, 355 U.S. 220, 224, 78 S.Ct. 199, 201, 2 L.Ed.2d 223 (1957). *See* Part IV *infra*.

"nationalization of commerce," the tremendous growth "in the amount of business conducted by mail across state lines," and the frequency with which "commercial transactions touch two or more States," there had developed "a trend . . . clearly discernible toward expanding the permissible scope of state jurisdiction over foreign corporations and other nonresidents." *Id.* at 222–23, 78 S.Ct. at 200–01.

The broad scope of *in personam* jurisdiction augured by *McGee* is not unlimited, however. Later the same Term the Court announced in *Hanson v. Denckla*, 357 U.S. 235, 251, 78 S.Ct. 1228, 1238, 2 L.Ed.2d 1283 (1958), that "it is a mistake to assume that this trend heralds the eventual demise of all restrictions on the personal jurisdiction of state courts." First, the Court stated, the due process restrictions on personal jurisdiction "are more than a guarantee of immunity from inconvenient or distant litigation. They are a consequence of territorial limitations on the power of the respective States." *Id.*[8] The Court then emphasized that

> [h]owever minimal the burden of defending in a foreign tribunal, a defendant may not be called upon to do so unless he has had the "minimal contacts" with that State that are a prerequisite to its exercise of power over him. . . .
>
> . . . .
>
> . . . The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State. The application of that rule will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of

the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.

*Id.* at 251, 253, 78 S.Ct. at 1238, 1239 (citations omitted).

In later cases the Supreme Court has supplemented the "purposely avails" language of *Hanson*[9] to require that the defendant's conduct and connection with the forum state be such that "he could reasonably have anticipated being 'haled before a [court of that state].' " *Kulko v. California Superior Court*, 436 U.S. 84, 97–98, 98 S.Ct. 1690, 1699, 56 L.Ed.2d 132 (1978) (quoting *Shaffer v. Heitner*, 433 U.S. 186, 216, 97 S.Ct. 2569, 2586, 53 L.Ed.2d 683 (1977)). Indeed, this, together with the territoriality concerns of *Hanson*, was most recently reaffirmed by the Court in *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). *See id.* at 294, 297, 100 S.Ct. at 565, 567.

### III

As indicated, in addition to "traditional notions of fair play and substantial justice," the Court has long maintained that concerns of territoriality underlie the limits the due process clause places on the power of a state to exercise personal jurisdiction over a defendant.[10] This concern with federalism as an underpinning to the proper exercise of *in personam* jurisdiction was reiterated in *World-Wide Volkswagen Corp. v. Woodson, supra*:

> [T]he Due Process Clause "does not contemplate that a state may make binding a judgment *in personam* against an individual or corporate defendant with which the state has no contacts, ties, or

**8.** *See International Shoe Co. v. Washington*, 326 U.S. 310, 317, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (must be reasonable "in the context of our federal system of government" to require defendant to defend suit in forum state).

**9.** *See* Woods, *Pennoyer's Demise: Personal Jurisdiction after Shaffer and Kulko and a Modest Prediction Regarding World-Wide Volkswagen Corp. v. Woodson*, 20 Ariz.L.Rev. 861, 887–88 (1978); Columbia Comment, *supra* note 6, at 1357.

**10.** *See* note 8 *supra* and accompanying text. *See also* Currie, *supra* note 6, at 533–34; Columbia Comment, *supra* note 6, at 1344. *But see* Casenote, *Retracting the Long Arm: World-Wide Volkswagen Corp. v. Woodson and Rush v. Savchuk*, 22 B.C.L.Rev. 385, 387 (1981) (threshold federalism inquiry of *World-Wide Volkswagen* and *Rush* is "significant departure from the approach in previous minimum contacts cases").

relations." *International Shoe Co. v. Washington*, 326 U.S. at 319 [66 S.Ct. at 159]. Even if the defendant would suffer minimal or no inconvenience from being forced to litigate before the tribunals of another State; even if the forum State has a strong interest in applying its law to the controversy; even if the forum State is the most convenient location for litigation, the Due Process Clause, acting as an instrument of interstate federalism, may sometimes act to divest the State of its power to render a valid judgment. *Hanson v. Denckla, supra*, at 251, 254 [78 S.Ct. at 1238, 1240].

*Id.* at 294, 100 S.Ct. at 565.

Perhaps the most detailed discussion of this "instrument of interstate federalism" as a limitation on the scope of state judicial power was undertaken by the Court of Appeals for the Third Circuit in *Empire Abrasive Equipment Corp. v. H. H. Watson, Inc.*, 567 F.2d 554 (3d Cir. 1977). There, Judge Gibbons, quoting extensively from his earlier concurrence in *Jonnet v. Dollar Savings Bank*, 530 F.2d 1123, 1140 (3d Cir. 1976), described the territorial restrictions of due process:

> [O]ut of respect for values of federalism, the due process clause [forbids] a state to exercise its adjudicatory authority in a manner that would encroach upon the sovereignty of a sister state. A state must have some palpable interest—rationally connected with public policy—in adjudicating a dispute within its borders for jurisdiction to be lawfully acquired.... Although some other sovereign state may have a superior interest in having the controversy finally adjudged in its courts, our system of federalism has recognized that such conflicts between states will often arise, and has concluded that as long as the forum's interest in opening its courts to the litigants is of due process dimensions, the sovereign rights of a sister state are not unconstitutionally abridged.

*Empire Abrasive Equipment Corp. v. H. H. Watson, Inc., supra*, 567 F.2d at 557 (quoting *Jonnet v. Dollar Savings Bank, supra*, 530 F.2d at 1140 (Gibbons, J., concurring) (citing *International Shoe* )).[11] This limitation, he concluded, interacts conjunctively with concerns of fundamental fairness to the defendant:

> Thus a state may exercise its jurisdiction in a manner consistent with values of federalism, but if that exercise would nevertheless be fundamentally unfair to the defendant, the power is void. Similarly, it may not be unfair to subject a defendant to suit in a particular state, but if that state lacks the requisite contacts with the parties or the subject matter, its assumption of jurisdiction would impermissibly intrude upon another sovereign's right to have its courts adjudicate disputes of interest to it.

*Id.* at 557–58 (quoting *Jonnet v. Dollar Savings Bank, supra*, 530 F.2d at 1140 (Gibbons, J., concurring)).

■ While *Empire* emphasizes that concerns for state sovereignty underlie any analysis of *in personam* jurisdiction, and that these concerns are quite real, *id.* at 557, it is equally emphatic that "the due process clause defines a rather low threshold of state interest sufficient to justify exercise of the state's sovereign decisional authority with respect to a given transaction." *Id.* (quoting *Aldens, Inc. v. Packel*, 524 F.2d 38 (3d Cir. 1975), *cert. denied*, 425 U.S. 943, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976)). Indeed, the facts of *Empire* make clear just how low this threshold is—at least that portion posed by federalism. The case involved an action for breach of contract by a Pennsylvania corporate seller against a Rhode Island corporate buyer. In addition to the buyer, plaintiff joined a Rhode Island bank as a defendant for refusing payment on a letter of credit issued by it for the benefit of defendant. The letter of credit was payable at the bank in Rhode Island upon presentation of plaintiff's invoice evidenc-

11. *But see* Columbia Comment, *supra* note 6, at 1347 ("[T]he forum state's interest must rise to a level that outweighs the interest of the defendant's state—indeed of all sister states—in protecting its residents against the burden of defending suits brought in distant and inconvenient forums").

ing shipment, together with a receipt for the goods signed by an agent of defendant; the bank had done nothing whatever in Pennsylvania. On these facts the court held that Pennsylvania not only had sufficient interest in protecting its corporate resident seller to justify exercise of its adjudicatory authority over the Rhode Island buyer to the exclusion of other sovereignties, it had, as well, sufficient interest to justify a similar exercise of authority over the Rhode Island bank, thus rising above the threshold imposed by the territorial restrictions of due process:

> In the instant case, subjecting the bank to Pennsylvania's jurisdiction would not transgress the [federalism concerns of due process]. While it is probably true that Rhode Island has a more substantial sovereign interest in the resolution of the dispute, it cannot be said that Pennsylvania's interest is so insubstantial that its exercise of decisional authority would impermissibly intrude on Rhode Island's right to have its courts adjudicate. Pennsylvania is the corporate residence of the plaintiff beneficiary, and the letter of credit was issued in connection with the sale of goods by the Pennsylvania seller. These contacts establish some Pennsylvania sovereign interest.

*Id.* at 558.[12]

■■■■ Thus, virtually any rational state interest will be sufficient to surmount this initial due process barrier. Plainly, such an interest exists in the present case. New Jersey has a strong interest both in providing a forum for its residents[13] and in holding parties who contract with its residents to their obligations.[14]

The more difficult question, of course, is whether, on the facts now before me, the exercise of jurisdiction *in personam* over defendant Metal World would comport with traditional notions of fair play and substantial justice, the second limitation posed by the due process clause; that is, in the language of *World-Wide Volkswagen, Kulko,* and *Shaffer,* whether Metal World's conduct and connection with New Jersey were such that it should reasonably have anticipated being haled into court here. It is to that question I now turn.

## IV

Of the Supreme Court decisions that have examined *in personam* jurisdiction, the closest to the present case is unquestionably *McGee v. International Life Insurance Co., supra;* in fact, plaintiff relies on *McGee* almost exclusively.[15]

*McGee* is subject to two interpretations, however. Jurisdiction in *McGee* was founded on California's Unauthorized Insurers Process Act, Cal.Ins.Code §§ 1610–1620 (Deering 1950), and the Supreme Court re-

---

**12.** Having found concerns of federalism met, the court quite properly held that, as to the bank, the *exercise* of Pennsylvania's power to adjudicate "would offend traditional notions of fair play and substantial justice," *Empire Abrasive Equipment Corp. v. H. H. Watson, Inc.,* 567 F.2d 554, 558 (3d Cir. 1977). *Empire* is important, however, because it illustrates that the limitations of federalism, at least in this circuit, are meager indeed. Nevertheless, as our concept of fundamental fairness permits the exercise of *in personam* jurisdiction over defendants with increasingly attenuated contacts with the forum state—as jurisdictional requisites evolve with changes in transportation, communication, and the way business is conducted—it is analytically important, and will become increasingly so, to keep distinct the "twin limitations," *id.* at 557 (quoting *Jonnet v. Dollar Savings Bank,* 530 F.2d 1123, 1140 (3d Cir. 1976)), of the due process clause.

**13.** *See, e. g., Standard Fittings Co. v. Sapag, S. A.,* 625 F.2d 630, 641 (5th Cir. 1980); *Southwest Offset, Inc. v. Hudco Publishing Co.,* 622 F.2d 149, 152 (5th Cir. 1980); Kurland, *supra* note 4, at 591; Columbia Comment, *supra* note 6, at 1346.

**14.** *Standard Fittings Co. v. Sapag, S. A.,* 625 F.2d 630, 644 (5th Cir. 1980); *Vencedor Mfg. Co. v. Gougler Indus., Inc.,* 557 F.2d 886, 890 (1st Cir. 1977); *In-Flight Devices Corp. v. Van Dusen Air, Inc.,* 466 F.2d 220, 232 (6th Cir. 1972); Currie, *supra* note 6, at 565.

**15.** The New Jersey authorities relied upon by plaintiff, *J. W. Sparks & Co. v. Gallos,* 47 N.J. 295, 220 A.2d 673 (1966); *Unicon Inv's. v. Fisco, Inc.,* 137 N.J.Super. 395, 349 A.2d 117 (Law Div. 1975), are neither binding upon this court, *see* pp. 1042–1043 *supra,* nor particularly persuasive.

ferred in its opinion to California's "manifest interest in providing effective means of redress for its residents when their insurers refuse to pay claims." *McGee v. International Life Insurance Co., supra,* 355 U.S. at 223, 78 S.Ct. at 201. Later, in *Hanson* the Court utilized this as a point of distinction between the two cases:

> This case is also different from *McGee* in that there the State had enacted special legislation (Unauthorized Insurers Process Act) to exercise what *McGee* called its "manifest interest" in providing effective redress for citizens who had been injured by nonresidents engaged in an activity that the State treats as exceptional and subjects to special legislation.

*Hanson v. Denckla, supra,* 357 U.S. at 252, 78 S.Ct. at 1239. This language, and that quoted immediately above from *McGee,* has been viewed by a number of authorities to substantially restrict *McGee*'s scope;[16] occasionally it is combined with the *Hanson* Court's declaration that "it is a mistake to assume that this trend heralds the eventual demise of all restrictions on the personal jurisdiction of state courts." *Id.* at 251, 78 S.Ct. at 1238. *See, e. g., Vencedor Manufacturing Co. v. Gougler Industries, Inc.,* 557 F.2d 886, 890 (1st Cir. 1977).

On the other hand, the essential facts of *McGee* do indeed closely resemble those underlying the contract at issue here: a contract solicited by mail by an out-of-state defendant-seller that had no other contacts with the forum state, and payments made by mail, from the forum state, by a forum-state resident.[17] Certainly, on these facts alone *McGee* sweeps quite broadly. And the case has been so construed.[18]

16. *See, e. g., Lakeside Bridge & Steel Co. v. Mountain State Constr. Co.,* 597 F.2d 596, 600 (7th Cir. 1979), *cert. denied,* 445 U.S. 907, 100 S.Ct. 1087, 63 L.Ed.2d 325 (1980) (*McGee* "based in substantial part on the special nature of the business of insurance" and must be read in conjunction with *Hanson*); *Vencedor Mfg. Co. v. Gougler Indus., Inc.,* 557 F.2d 886, 890 (1st Cir. 1977) (special status of insurance in state law justified *McGee*'s "sweeping assertion of jurisdiction"; court found "no doubt that *Hanson* reduces the potential sweep of *McGee*"); *Trippe Mfg. Co. v. Spencer Gifts, Inc.,* 270 F.2d 821, 822 (7th Cir. 1959) ("[W]e think [*Hanson*] demonstrates the McGee case has been limited by the Court to the insurance field"); Carrington & Martin, *Substantive Interests and the Jurisdiction of State Courts,* 66 Mich.L.Rev. 227, 238 (1967) (Court "careful to circumscribe" *McGee* decision by reference to substantive importance of insurance regulation); Columbia Comment, *supra* note 6, at 1345 (*McGee* Court found jurisdiction "largely" because of state's insurance statute).

17. I note, however, that unlike the present case, which involves only corporate parties, the insured in *McGee* was an individual. This is not a distinction I find dispositive. *See* note 38 *infra.*

18. *See, e. g., Pedi Bares, Inc. v. P & C Food Markets, Inc.,* 567 F.2d 933, 936–37 (10th Cir. 1977) (*Hanson* "did not modify the *McGee* decision"; forum state [with liberal long-arm statute] has "manifest interest" in protecting its residents against breach of a contract by nonresident for purchase of goods made in forum state); *Vencedor Mfg. Co. v. Gougler Indus., Inc.,* 557 F.2d 886, 891 (1st Cir. 1977) ("After *McGee* it seems fair to say that one who solicits in a state may be sued there if the transaction he has sought goes sour"); *Product Promotions, Inc. v. Cousteau,* 495 F.2d 483, 497 n.26 (5th Cir. 1974) ("*McGee* demonstrated that a single contract by mail can be constitutionally sufficient, reducing the minimum contacts requirement, in the words of one scholar, 'to a gossamer touch' "); *Roumel v. Drill Well Oil Co.,* 270 F.2d 550, 557 (5th Cir. 1959) (*Hanson* "did not indicate that it was taking back anything said in *McGee* [or] *International Shoe*"); *Marival, Inc. v. Planes, Inc.,* 302 F.Supp. 201, 206 (N.D.Ga.1969) ("[T]he majority of cases seem to feel that *Hanson v. Denckla* was merely another application of the *International Shoe* doctrine to a different set of facts . . . and imposed no restrictions on *McGee* or on the minimum contacts test"); *Kornfuehrer v. Philadelphia Bindery, Inc.,* 240 F.Supp. 157, 161 (D.Minn.1965) (as to whether a state's interest in providing a forum for suits against foreign insurance companies is greater than its interest in other contract actions: "The Supreme Court does not appear to rely heavily on any such factor in *McGee* and this Court does not see any substantial difference"); Currie, *supra* note 6, at 549 ("The suggestion that *McGee* should be limited to matters . . . in which the state has some 'special' regulatory interest is [not] persuasive"); Gorfinkel & Lavine, *Long-Arm Jurisdiction in California Under New Section 410.-10 of the Code of Civil Procedure,* 21 Hastings L.J. 1163, 1211 (1970) (*McGee*'s "language was general . . . and not limited to insurance contracts"); Kurland, *supra* note 4, at 622 (*Hanson*'s attempt to distinguish *McGee* "hardly persuasive"); Louis, *The Grasp of Long Arm Jurisdiction Finally Exceeds Its Reach: A Com-*

As reference to the authorities cited in notes 16 and 18 *supra* makes clear, the least that can be said of *McGee* is that there is a sharp division of opinion as to its meaning and, *a fortiori*, its significance for the present case. A broad reading of the decision is virtually dispositive of the jurisdictional issue raised here; a narrow reading renders the opinion significantly less relevant: Certainly New Jersey does not have the same legislatively mandated interest in providing a forum for its corporate buyers that the *McGee* statute makes clear California wished to provide its resident insured.[19]

I believe the broad reading of *McGee* is the more appropriate. While *Hanson* plainly indicates that *McGee* should not be construed to signal the "eventual demise" of all limitations on *in personam* jurisdiction, such an end is precluded by the ever-present concerns of interstate federalism referred to earlier.[20] Indeed, the Court's refutation of any notion that *McGee* presaged the removal of all restrictions on *in personam* jurisdiction immediately precedes the Court's reiteration that "territorial limitations on the power of the respective States" provide a partial underpinning for those restrictions.

In other respects, Hanson actually supports a broad interpretation of *McGee*. The language much pointed to by authorities reaching the opposite conclusion—to the effect that the California insurance statute in *McGee* reflected the state's "manifest interest" in protecting its insured, *Hanson v.*

*Denckla, supra,* 357 U.S. at 252, 78 S.Ct. at 1239; *see* note 16 *supra*—is actually described by the Court as merely an additional reason to distinguish *McGee*. The Court's primary rationale for distinguishing the case is stated immediately preceding its discussion of the California insurance statute:

> [T]he record discloses no instance in which the [defendant] performed any acts in Florida that *bear the same relationship to the agreement as the solicitation in McGee. Consequently, this suit cannot be said to be one to enforce an obligation that arose from a privilege the defendant exercised in Florida.* Cf. *International Shoe Co. v. Washington,* 326 U.S. 310, 319 [66 S.Ct. 154, 159, 90 L.Ed. 95]. This case is also different . . . [because of the California insurance statute in *McGee*].

*Id.* (emphasis added).

The clear implication here is that by soliciting the contract at issue in *McGee*, the defendant had "purposely avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws," id. at 253, 78 S.Ct. at 1239—all that *Hanson* requires for *in personam* jurisdiction to comport with due process.

A second persuasive argument against distinguishing *McGee* on the basis of the California statute has been advanced by Professor David Currie. In an article in which he concludes that the interest of the forum state in providing a forum for its residents is no greater in tort actions than

---

ment on *World-Wide Volkswagen Corp. v. Woodson* and *Rush v. Savchuk,* 58 N.C.L.Rev. 407, 429 (1980) ("[A] defendant who solicits or initiates interstate sales transactions by carrier, mail or telephone must ordinarily litigate wherever his customers live") (citing *McGee*); Comment, *Long-Arm Jurisdiction and Quasi in Rem Jurisdiction and the Fundamental Test of Fairness,* 69 Mich.L.Rev. 300, 325 (1970) (*McGee* "suggests that the mere existence of a contract to which a resident of the forum state is a party provides a sufficient basis for the assertion of jurisdiction") [hereinafter Michigan Comment].

19. But *see Pedi Bares, Inc. v. P & C Food Markets, Inc.,* 567 F.2d 933, 937 (10th Cir. 1977) (broad, single-act long-arm statute described as "special legislation," and forum state has "manifest interest in providing redress for its residents injured by nonresidents engaged in any activity which the state treats as subject to special legislation") (single-contract case). Indeed, I do not suggest New Jersey has no legislatively mandated interest here; N.J.Civ. Prac.R. 4:4–4 is clear proof to the contrary. The difference is simply one of degree, and, as *Pedi Bares* suggests, that degree may not be great.

20. *See* Part III of this opinion *supra*.

it is in contract cases, *see* Currie, *supra* note 6, at 569–70,[21] he states:

> The suggestion that McGee should be limited to matters (such as insurance, securities, and highways) in which the State has some "special" regulatory interest is no more persuasive when the defendant acts outside the State than when he acts inside. I cannot see why a State is any less strongly concerned to ensure that its injured residents recover compensation from those who injure them than from those who promise to pay for injuries caused by others. The decisions determining the liability of a tort defendant for acts in one State according to the law of another State in which the injury occurred are legion. When the State's interest justifies choice of its substantive law, the question of jurisdiction is half solved. The essence of the second requirement, imposed by *Hanson*, is that the defendant must have taken voluntary action calculated to have an effect in the forum State. This 'was satisfied in *McGee* by the voluntary acceptance of an obligation to insure a California resident
> . . . .

*Id.* at 549 (footnotes omitted).

Finally, *McGee* itself supports its own broad reading—and application to this case. Despite the Court's reference to California's "manifest interest" in protecting its insured, the California statute did not become law until *after* the insurance contract had been entered. *McGee v. International Life Insurance Co., supra*, 355 U.S. at 224, 78 S.Ct. at 201. The statute therefore provided International Life Insurance Co. with no greater notice that it would be "haled into court" in California than New Jersey provided defendant here. Indeed, to the extent that the insurance company should reasonably have anticipated being required to litigate in California, that anticipation could have been supplied only by its acts of solicitation and contract, acts on a par—indeed, less compelling in terms of the absolute number of contacts—with those of Metal World. Consequently, the degree of "anticipation" that was constitutionally sufficient in *McGee* is, I find, both present and sufficient here.

A review of the solicitation and negotiation of the Alchemie-Metal World contract, and of the contract itself, buttresses this conclusion.

■ It is uncontested that defendant has its principal place of business in Illinois, maintains no office in New Jersey, and has sent none of its personnel into the State on business for this or any other transaction.[22] From this, defendant argues that "the absence of virtually any contacts with New Jersey" mandates dismissal of the complaint. Defendant's Brief at 3. However, this assertion overlooks several important factors.

Defendant seeks to minimize the significance of the mail and telephone contacts with Alchemie that attended its solicitation, negotiation, and execution of the contract, citing *Deloro Smelting & Refining Co. v. Engelhard Minerals & Chemicals Corp.*, 313 F.Supp. 470 (D.N.J.1970). *See* Defendant's Brief at 12. While it is true that there is some authority for this position,[23] I judge

---

**21.** *See also* Carrington & Martin, *supra* note 16, at 239.

**22.** I reject plaintiff's contention that Ledoux and Associated are agents of Metal World and that, therefore, their contacts with New Jersey should be attributed to defendant; it is sufficiently rebutted by the Becker Affidavit ¶ 4 (Associated "is not authorized to solicit business or otherwise act for Metal World, Inc."), and the Second Plocker Affidavit ¶ 5 (Ledoux "is not authorized to solicit business or otherwise act for Metal World, Inc.").

**23.** *See Koster v. Automark Indus. Inc.*, 640 F.2d 77, 79 (7th Cir. 1981) (letters, telegrams, and telephone calls cannot be contacts sufficient to support jurisdiction, because "[s]uch a result would make virtually every business subject to suit in any state with which it happened to communicate in some manner"); *Benjamin v. Western Boat Building Corp.*, 472 F.2d 723, 731 (5th Cir.), *cert. denied*, 414 U.S. 830, 94 S.Ct. 60, 38 L.Ed.2d 64 (1973) (telephone and mail communications do not indicate defendant "ever purposefully availed itself of the benefits and protections of the [forum state]"). *See also Lakeside Bridge & Steel Co. v. Mountain State Constr. Co.*, 597 F.2d 596, 604 (7th Cir.

the better view to be that these contacts should be accorded substantial weight in the present context.[24] I see little to distinguish a corporation's using the telephone and mail to solicit and negotiate a contract the size of that at issue here from that same corporation sending an agent into the state in pursuit of the identical contract from the identical buyer. In this regard, an observation made by the Seventh Circuit ten years ago is equally if not more true today:

> The test of whether business was transacted within the state must be applied in the context, not of communication and transportation criteria of yesteryears, but of modern day commercial and personal accelerated relationships. The long arm statutes are comrades of the computer.

*O'Hare International Bank v. Hampton*, 437 F.2d 1173, 1177 (7th Cir. 1971).[25]

It is clear to me that, at least in the context of this substantial commercial contract, Metal World's mail and telephone contacts with plaintiff in New Jersey simply served to replace what would have been the time-consuming and considerably more costly prospect of travel to this State, *see In-Flight Devices Corp. v. Van Dusen Air,*

*Inc.*, 466 F.2d 220, 235 (6th Cir. 1972) ("A letter or a telephone call may, in a given situation, be as indicative of substantial involvement with the forum state as a personal visit by the defendant or its agents"); Northwestern Note, *supra* note 24, at 360, a prospect the company would nevertheless have been forced to accept if it were to continue to do business on an interstate basis, as it apparently does.[26] *See* Ardinto Affidavit ¶ 3. Indeed, a refusal to acknowledge the fashion in which modern business is conducted and the increasingly dominant role played in that conduct by mail and telephone communications is as much a return to the shibboleths of *Pennoyer v. Neff*, 95 U.S. 714, 5 Otto. 714, 24 L.Ed. 565 (1878), long abandoned by the Court, *see World-Wide Volkswagen Corp. v. Woodson, supra*, 444 U.S. at 293, 100 S.Ct. at 565, and the "magical and medieval concepts of presence and power" that typified that era[27] as would resurrection of the notion that a defendant must be present within the territorial jurisdiction of a court before its judgment will bind him. I therefore count defendant's calls and mail communications to plaintiff as significant contacts with the State of New Jersey.[28]

1979), *cert. denied*, 445 U.S. 907, 100 S.Ct. 1087, 63 L.Ed.2d 325 (1980); *Aaron Ferer & Sons Co. v. Atlas Scrap Iron & Metal Co.*, 558 F.2d 450, 455 (8th Cir. 1977); *Agrashell, Inc. v. Bernard Sirotta Co.*, 344 F.2d 583, 587 (2d Cir. 1965); *Empresa Nacional Siderurgica, S. A. v. Glazer Steel Co.*, 503 F.Supp. 1064, 1065 (S.D. N.Y.1980); *Baron & Co. v. Bank of N.J.*, 497 F.Supp. 534, 538 (E.D.Pa.1980).

**24.** *See Product Promotions, Inc. v. Cousteau*, 495 F.2d 483, 496 (5th Cir. 1974) ("contact by mail alone can be sufficient"); *In-Flight Devices Corp. v. Van Dusen Air, Inc.*, 466 F.2d 220, 235 (6th Cir. 1972) ("A letter or a telephone call may, in a given situation, be as indicative of substantial involvement with the forum state as a personal visit by the defendant or its agents"); *Electro-Craft Corp. v. Maxwell Electronics Corp.*, 417 F.2d 365, 369 (8th Cir. 1969) (mail and telephone contacts relevant). *See also Hanson v. Denckla, supra*, 357 U.S. at 251, 78 S.Ct. at 1238 ("[T]he record discloses no solicitation of business in that State either in person *or by mail*") (emphasis added); *Louis, supra* note 18, at 429; Note, *Lakeside Bridge & Steel Co. v. Mountain Construction Co.: Inflexible Application of Long-Arm Juris-*

*diction Standards to the Nonresident Purchaser*, 75 Nw.L.Rev. 345, 360 (1980) [hereinafter Northwestern Note].

**25.** Too, *McGee*, decided almost a quarter-century ago, involved the mails exclusively, the Court remarking on the "great increase in the amount of business conducted by mail across state lines." *McGee v. International Life Ins. Co., supra*, 355 U.S. at 223, 78 S.Ct. at 201.

**26.** *Cf. McGee v. International Life Ins. Co., supra* (insurance company unlikely to send agent into state to solicit single life insurance policy).

**27.** *Simpson v. Loehmann*, 21 N.Y.2d 305, 311, 287 N.Y.S.2d 633, 234 N.E.2d 669 (1967).

**28.** *See* Currie, *supra* note 6, at 568:

> When a defendant has sent an agent into the State to solicit or negotiate a contract concerning the purchase or sale of goods to [a forum-state resident], it is difficult to deny that it has transacted business here or that it has "avail[ed] itself of the privilege of conducting activities within the forum State."

There is the suggestion in defendant's papers that the contract between Metal World and Alchemie was entered in Illinois and that this should count against finding jurisdiction. Defendant's Brief at 8–9. Even assuming the contract was finally executed in Illinois, see *M. N. Axinn Co. v. Gibralter Development, Inc.*, 45 N.J.Super. 523, 536, 133 A.2d 341 (App.Div.1957) ("A contract arising from use of the mails is deemed to be entered when the offeree posts his acceptance"), the place of contract in a transaction of this nature is irrelevant for purposes of the jurisdictional question now before me.[29]

On the other hand, defendant's solicitation of the contract I regard as relevant indeed[30] as it relates to whether Metal World "purposely avail[ed] itself of the privilege of conducting activities within [New Jersey]," *Hanson v. Denckla, supra,* 357 U.S. at 253, 78 S.Ct. at 1239. Similarly, the provision of the contract that provides New Jersey law will apply militates in favor of jurisdiction.[31] Indeed, the Court of Appeals for the Seventh Circuit—not a court known for its liberal view of *in personam* jurisdiction, see *Lakeside Bridge & Steel Co. v. Mountain State Construction Co.*, 597 F.2d 596 (7th Cir. 1979), *cert. de-*

nied, 445 U.S. 907, 100 S.Ct. 1087, 63 L.Ed.2d 325 (1980), *criticized in* Northwestern Note, *supra* note 24—has stated:

> [T]he fact that the guaranty was to be construed according to Illinois law and performed in that state clearly demonstrates that the defendants "invoked the benefits and protection" of the state.

*O'Hare International Bank v. Hampton*, 437 F.2d 1173, 1177 (7th Cir. 1971).

I do not accept defendant's suggestion, Defendant's Brief at 13, that a second provision of the contract, "F.O.B. East St. Louis," should be accorded jurisdictional significance, and I give it no weight.[32] What relevance the term has goes only to whether defendant should reasonably have anticipated New Jersey litigation. However, there is no assertion by either party that defendant knew or did not know of the ultimate destination of the molybdenum oxide, though I note plaintiff's contention that defendant may well have expected the material would ultimately be shipped to New Jersey, McKenna Affidavit ¶ 7, has gone unrebutted.

The considerations above—of defendant's contacts with the forum state, its initiation

---

**29.** *Vencedor Mfg. Co. v. Gougler Indus., Inc.*, 557 F.2d 886, 890 (1st Cir. 1977):

When contracts are made by mail, the place of making may be difficult to pin down. The intricacies of offer, counteroffer, and invitation to make an offer are irrelevant to the central concern for fairness that should illuminate this area of the law.... Thus we give no weight to the fact that Vencedor's orders were accepted, and the contract made, in Ohio.

See Currie, *supra* note 6, at 572–74; Note, *Nonresident Jurisdiction and the New England Experience*, 48 B.U.L.Rev. 372, 424 (1968); Michigan Comment, *supra* note 18, at 321.

**30.** See *Empire Abrasive Equip. Corp. v. H.H. Watson, Inc.*, 567 F.2d 554, 559 (3d Cir. 1977); *Bernardi Bros., Inc. v. Pride Mfg., Inc.*, 427 F.2d 297, 301 n.9 (3d Cir. 1970); Louis, *supra* note 18, at 429.

**31.** See *Southwest Offset, Inc. v. Hudco Publishing Co.*, 622 F.2d 149, 152 (5th Cir. 1980); *United States Ry. Equip. Co. v. Port Huron & Detroit R. Co.*, 495 F.2d 1127, 1130 (7th Cir. 1974); *Product Promotions, Inc. v. Cousteau*, 495 F.2d 483, 498 n.27 (5th Cir. 1974); *O'Hare*

*Int'l Bank v. Hampton*, 437 F.2d 1173, 1177 (7th Cir. 1971). *But see Agrashell, Inc. v. Bernard Sirotta Co.*, 344 F.2d 583, 588 (2d Cir. 1965) (contract's choice-of-law provision "cannot be construed as a voluntary submission by [defendant] to the personal jurisdiction of the [forum-state] courts in the absence of any express contractual understanding to that effect"); *Baron & Co., Inc. v. Bank of N. J.*, 497 F.Supp. 534, 538 (E.D.Pa.1980) ("The mere presence of a choice of law provision in a contract is not sufficient to vest jurisdiction in a court").

**32.** *Vencedor Mfg. Co. v. Gougler Indus., Inc.*, 557 F.2d 886, 891 (1st Cir. 1977) (shipping terms should be irrelevant on the issue of whether sufficient minimum contacts ... allow [the forum state] to exercise jurisdiction") (quoting *Kornfuehrer v. Philadelphia Bindery, Inc.*, 240 F.Supp. 157, 160 n.4 (D.Minn.1965)). See *Lakeside Bridge & Steel Co. v. Mountain State Constr. Co.*, 597 F.2d 596, 604 n.14 (7th Cir. 1979), *cert. denied*, 445 U.S. 907, 100 S.Ct. 1087, 63 L.Ed.2d 325 (1980); *Electro-Craft Corp. v. Maxwell Electronics Corp.*, 417 F.2d 365, 369 (8th Cir. 1969).

of contract negotiations, and its agreement as to choice of law—all speak to the question of fairness to the defendant: whether it is "reasonable . . . to require the corporation to defend the particular suit which is brought [in the forum state]," *International Shoe Co. v. Washington, supra*, 326 U.S. at 317, 66 S.Ct. at 158; whether defendant "should reasonably have anticipat[ed] being haled into court there," *World-Wide Volkswagen Corp. v. Woodson, supra*, 444 U.S. at 297, 100 S.Ct. at 567. The Court has declared that forum-state interests are to be added to the *in personam* calculus at this stage of the inquiry as well: [33]

> Implicit in this emphasis on reasonableness is the understanding that the burden on the defendant, while always a primary concern, will in an appropriate case be considered in light of other relevant factors, including the forum State's interest in adjudicating the dispute . . . .

*Id.* at 292, 100 S.Ct. at 564.[34]

As indicated, New Jersey has a strong interest both in providing a forum for its residents and in holding parties who contract with its residents to their obligations. *See* notes 13 & 14 *supra* and accompanying text. The State also arguably has an interest here based on the in-state impact of breach of the contract. *See Restatement (Second) of Conflict of Laws* § 50 (1971). There is sound authority for the proposition

that a substantial *shipment* of goods into the forum state gives rise to *in personam* jurisdiction.[35] Thus, Currie has argued that

> "it would be passing strange to hold that a defendant is better off if he refuses altogether to perform his obligation than if he performs it unsatisfactorily—that he can immunize himself from service of process by breaking his contract. . . . The significant contact rendering it fair to the defendant that he be sued here is not the shipping of goods into the State so much as the promise to do so; by making this promise, he has purposefully availed himself of the benefits of doing business with [people in the forum state]."

Currie, *supra* note 6, at 570. Given this, in terms of impact—economic injury—in the forum state, I find it difficult to distinguish between breach, by refusal to perform, of a contract to ship goods into the state and breach of the contract alleged here: Economic injury to the buyer is the primary result of each.[36]

Defendant argues that it will be forced to shoulder "tremendous burdens" if compelled to defend this action in this district. These protestations are unconvincing.

Whenever litigation arises out of business transactions conducted across state lines between parties whose principal

---

**33.** I note, in passing, that this is not entirely consistent with the niceties of the Court of Appeals for the Third Circuit's analysis in *Empire Abrasive Equipment Corp. v. H. H. Watson, Inc., supra. See* Part III *supra.*

**34.** This is not to suggest, of course, that a state's interest in providing a forum is a substitute for contacts with it by the defendant. *Rush v. Savchuk*, 444 U.S. 320, 332, 100 S.Ct. 571, 574, 62 L.Ed.2d 516 (1980). *See* Note, *Rush v. Savchuk: Is the Seider Spoiled or Just Getting Harder?* 9 Hofstra L.Rev. 247 (1980).

**35.** *See, e. g., Product Promotions, Inc. v. Cousteau*, 495 F.2d 483 (5th Cir. 1974); *Ajax Realty Corp. v. J. F. Zook, Inc.*, 493 F.2d 818 (4th Cir. 1972), *cert. denied*, 411 U.S. 966, 93 S.Ct. 2148, 36 L.Ed.2d 687 (1973); *Electro-Craft Corp. v. Maxwell Electronics Corp.*, 417 F.2d 365 (8th Cir. 1969). *But see Erlanger Mills, Inc. v. Cohoes Fibre Mills, Inc.*, 239 F.2d 502 (4th Cir. 1956).

**36.** Plaintiff suggests that in terms of *performance* of the contract itself, its payment of funds to defendant also had impact on New Jersey, because payment was made through New Jersey banks. McKenna Affidavit ¶¶ 4, 7. Defendant disputes plaintiff's assertion as to where payment originated, *see* Plocker Affidavit ¶ 4, but at this point in the litigation, the question must be resolved in plaintiff's favor. *United States Ry. Equip. Co. v. Port Huron & Detroit R. Co.*, 495 F.2d 1127, 1128 (7th Cir. 1974); *O'Hare Int'l Bank v. Hampton*, 437 F.2d 1173, 1176 (7th Cir. 1971). Nevertheless, mindful of *Hanson's* admonition that "[t]he unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State," *Hanson v. Denckla, supra*, 357 U.S. at 253, 78 S.Ct. at 1239, I do not accord this great weight.

places of business are in different states, there may be hardship to the party required to litigate away from home. There is no constitutional requirement, however, that this hardship must invariably be borne by the plaintiff whenever the defendant is not deemed present in the state of plaintiff's residence.

*Henry R. Jahn & Son, Inc. v. Superior Court*, 49 Cal.2d 855, 323 P.2d 437, 440 (1958) (en banc).[37]

In this day of modern communication and transportation, the inconvenience and expense of trial in this State, while by no means negligible, simply does not rise to constitutional dimension with respect to this defendant.[38]

Metal World cites a number of decisions that it argues should compel a result different from that reached here. These do not merit extended discussion. While all find jurisdiction lacking, and a few approach the facts of this case,[39] none is without distinguishing characteristics,[40] and there are numerous other cases, also approaching the facts here presented, which reach a contrary result.[41] The cases cited in notes 40

**37.** Indeed, "[d]ue process does not always single out the most appropriate State as the only one in which suit can be maintained." Currie, *supra* note 6, at 557.

**38.** This is not to suggest that there are not other circumstances in which it would be fundamentally unfair to force a defendant to litigate in this forum. For example,

> it would certainly be unfair to hold consumers answerable in a foreign forum for unpaid bills simply on the basis of a "mail order contract." Similarly, it may be unfair to hold even a small businessman to answer in such forum when he has done no more than fill out a standard order form for a relatively small purchase.

*In-Flight Devices Corp. v. Van Dusen Air, Inc.*, 466 F.2d 220, 227 n.13 (6th Cir. 1972).

On the other hand, it is unlikely that plaintiff would drop a litigation of this size, *cf. McGee v. International Life Ins. Co., supra*, 355 U.S. at 223, 78 S.Ct. at 201, if forced to litigate this action in Illinois. I do not, however, find this factor determinative.

**39.** *Aaron Ferer & Sons Co. v. Diversified Metals Corp.*, 564 F.2d 1211 (8th Cir. 1977); *Aaron Ferer & Sons Co. v. American Compressed Steel*, 564 F.2d 1206 (8th Cir. 1977); *Aaron Ferer & Sons Co. v. Atlas Scrap Iron & Metal Co.*, 558 F.2d 450 (8th Cir. 1977).

**40.** *See Scheidt v. Young*, 389 F.2d 58 (3d Cir. 1968) (per curiam) (out-of-state personal injury action; defendant's advertisements in an out-of-state newspaper circulated in New Jersey and single telephone call from plaintiff to defendant insufficient to confer jurisdiction); *Deloro Smelting & Ref. Co. v. Engelhard Minerals & Chem. Corp.*, 313 F.Supp. 470 (D.N.J.1970) (contacts unrelated to cause of action; no contractual choice-of-law provision); *Kislak, Inc. v. Trumbull Shopping Park*, 150 N.J.Super. 96, 374 A.2d 1246 (App.Div.1977) (plaintiff solicited retainer in defendant's state; contract provided law of defendant's state was to apply).

As to the *Ferer* cases, *see* note 39 *supra*, none of the contracts there at issue contained a choice-of-law provision, except one which provided that the law of defendant's state would apply. *See Aaron Ferer & Sons Co. v. Diversified Metals Corp.*, 564 F.2d 1211, 1215 (8th Cir. 1977). In addition, each of the contracts apparently specifically provided for shipment from defendant's state to a nonforum state. Moreover, there is no indication that the defendants in these cases solicited the goods sold by plaintiff, although the opinions do make clear there were extensive prior dealings between the parties.

For cases not cited by defendant, but arguably supporting its position (although each is distinguishable in some respect from the present case), *see, e. g., Koster v. Automark Indus. Inc.*, 640 F.2d 77 (7th Cir. 1981); *Thos. P. Gonzalez Corp. v. Consejo Nacional de Produccion de Costa Rica*, 614 F.2d 1247 (9th Cir. 1980); *Capital Dredge & Dock Corp. v. Midwest Dredging Co.*, 573 F.2d 377 (6th Cir. 1978); *Arkansas Poultry Coop., Inc. v. Red Barn Sys., Inc.*, 468 F.2d 538 (8th Cir. 1972). *See also Nu-Way Sys., Inc. v. Belmont Marketing, Inc.*, 635 F.2d 617 (7th Cir. 1980); *Lakeside Bridge & Steel Co. v. Mountain State Constr. Co.*, 597 F.2d 596 (7th Cir. 1979), *cert. denied*, 445 U.S. 907, 100 S.Ct. 1087, 63 L.Ed.2d 325 (1980); *Whittaker Corp. v. United Aircraft Corp.*, 482 F.2d 1079 (1st Cir. 1973); *Agrashell, Inc. v. Bernard Sirotta Co.*, 344 F.2d 583 (2d Cir. 1965); *Erlanger Mills v. Cohoes Fibre Mills, Inc.*, 239 F.2d 502 (1956).

**41.** *See, e. g., Product Promotions, Inc. v. Cousteau*, 495 F.2d 483 (5th Cir. 1974); *Ajax Realty Corp. v. J. F. Zook, Inc.*, 493 F.2d 818 (4th Cir. 1972), *cert. denied*, 411 U.S. 966, 93 S.Ct. 2148, 36 L.Ed.2d 687 (1973); *O'Hare Int'l Bank v. Hampton*, 437 F.2d 1173 (7th Cir. 1971); *Electro-Craft Corp. v. Maxwell Elec. Corp.*, 417 F.2d 365 (8th Cir. 1969); *Kornfuehrer v. Philadelphia Bindery, Inc.*, 240 F.Supp. 157 (D.Minn. 1965), *cited with approval in Vencedor Mfg. Co. v. Gougler Indus., Inc.*, 557 F.2d 886 (1st Cir. 1977). *See also Pedi Bares, Inc. v. P & C*

and 41 make clear there is a considerable division among the courts on where the "uttermost limits permitted by the ... Constitution," *Avdel Corp. v. Mecure, supra,* 58 N.J. at 268, 277 A.2d 207, actually lie. This division is hardly surprising. Dissenting from denial of certiorari in *Lakeside Bridge & Steel Co. v. Mountain State Construction Co.,* 445 U.S. 907, 100 S.Ct. 1087, 63 L.Ed.2d 325 (1980) (mem.), Justice White points to the "disarray" among long-arm decisions and states:

> The disarray among federal and state courts noted above may well have a disruptive effect on commercial relations in which certainty of result is a prime objective. That disarray also strongly suggests that prior decisions of this Court offer no clear guidance on the question.

*Id.* at 911, 100 S.Ct. at 1089 (White, J., dissenting).[42]

What is clear, however, is that in its decisions on this issue from *International Shoe* to *World-Wide Volkswagen,* much of the Court's analysis is concerned with fairness. *World-Wide Volkswagen,* most recently, emphasizes that individuals should have some notice, "some minimal assurance" in the Court's words, of what activities may make them amenable to suit in other states, thus permitting them to structure their primary conduct. *See World-Wide Volkswagen Corp. v. Woodson, supra,* 444 U.S. at 297, 100 S.Ct. at 567. I judge

Metal World was on such notice here when it solicited a contract of this size, with an explicit New Jersey choice-of-law provision, from a known resident of the State of New Jersey. If it then wished to ensure that it would not be exposed to litigation in New Jersey, a choice-of-forum provision could have been negotiated; absent such a provision, Metal World should reasonably have anticipated being haled into court in this state.

### V

As the foregoing discussion suggests, long-arm cases such as this are often difficult; this one is particularly so. Each must be decided on its own facts.[43] Indeed, I cannot say that, absent any of the elements I have found relevant here, there would be enough on these facts to confer jurisdiction; taken together, however, there is. Defendant's motion to dismiss will be denied.

---

*Food Markets, Inc.,* 567 F.2d 933 (10th Cir. 1977); *United States Ry. Equip. Co. v. Port Huron & Detroit R. Co.,* 495 F.2d 1127 (7th Cir. 1974); *In-Flight Devices Corp. v. Van Dusen Air, Inc.,* 466 F.2d 220 (6th Cir. 1972). In addition, I note that at least one commentator has argued that courts should exercise jurisdiction *in personam* in contract cases such as this in any state that is the residence of one of the parties. *See* Michigan Comment, *supra* note 18, at 322 (noting, *inter alia,* that in cases such as this one "potential litigational forums are readily ascertainable at the time of making the contract" and can be avoided, if desired, by additions to the contract). *See also* Currie, *supra* note 6, at 570 n.15 (contracting long

distance should suffice to establish jurisdiction).

42. Put in somewhat more metaphoric terms, the Court of Appeals for the Fifth Circuit has referred to the task of analyzing these cases as "trolling with tangled lines of authority for legal principles not to be found in surface waters." *Product Promotions, Inc. v. Cousteau,* 495 F.2d 483, 499 (5th Cir. 1974).

43. *Southwest Offset, Inc. v. Hudco Publishing Co.,* 622 F.2d 149, 151 (5th Cir. 1980). *See Product Promotions, Inc. v. Cousteau,* 495 F.2d 483, 499 (5th Cir. 1974) (these questions "prove themselves immune to solution by checklist").